## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| In re: Jason T. Turner, | Case No.: 19-30993 |
| Debtor(s). | Chapter 7 |
| | Hon. Laura K. Grandy |

### NOTICE OF APPEAL

Deighan Law LLC, f/k/a Law Solutions Chicago LLC and d/b/a in Illinois as UpRight Law LLC (hereafter referred to as "UpRight Law") and Jason T. Turner, the debtor(s) in this matter (individually, "Debtor(s)," and collectively with UpRight Law, "Appellants"), pursuant to Fed. R. Bank. Proc. 8002, 8003, and 8004 and 28 USC § 158, hereby jointly submit this Notice of Appeal. Appellants are seeking the District Court's review of the Order of the Bankruptcy Court entered September 17, 2020 (Doc. 52), which denied the Appellants' Motions to Close Case.

### Official Form 417A pursuant to Fed. R. Bankr. Proc. 9009

**Part 1: Identify the appellants**

1. **Name(s) of appellant(s):**

UpRight Law

Debtor(s), Jason T. Turner

2. **Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal: For appeals in a bankruptcy case and not in an adversary proceeding.**

Jason T. Turner, the Debtor(s) in this matter.

UpRight Law, counsel for Debtor(s).

**Part 2: Identify the subject of this appeal**

1. **Describe the judgment, order, or decree appealed from**:

   Order of the Bankruptcy Court entered September 17, 2020 (Doc. 52), which denied

   Appellants' Motions to Close Case.

2. **State the date on which the judgment, order, or decree was entered**:

   September 17, 2020.

**Part 3: Identify the other parties to the appeal**

**List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):**

1. Party: UpRight Law

Represented by:

Mark T. Lavery
8926 N. Greenwood, #115
Niles, IL 60714
(312) 792-9533
laverylawyer@gmail

and

 Charles A. Armgardt
Of Counsel
UpRight Law LLC
79 W. Monroe St.
Chicago, IL 60603
877-927-5451
carmgardt@uprightlaw.com

Party: Jason T. Turner, Debtor(s) in this matter.
Represented by:

Ronald Buch
5312 West Main
Belleville, IL 62226
Phone: (618)236-7000
Email: rbuch@tbcwam.com

2.   Party: Nancy J. Gargula, the United States Trustee for Region 10 ("UST")

Represented by:

Mark D. Skaggs, ARDC No. 6210087
U.S. Department of Justice
Office of the U.S. Trustee
401 Main St., Suite 1100
Peoria, IL 61602
Phone: (309) 671-7854, ext. 226
Email: Mark.D.Skaggs@usdoj.gov


Date: October 1, 2020                          Respectfully submitted,


                                               /s/ *Mark T. Lavery*
                                               Mark T. Lavery
                                               8926 N. Greenwood, #115
                                               Niles, IL 60714
                                               (312) 792-9533
                                               laverylawyer@gmail.com

                                               *Counsel for Deighan Law LLC d/b/a/
                                               UpRight Law LLC*

                                                Ronald Buch
                                                5312 West Main
                                                Belleville, IL 62226
                                                Phone: (618)236-7000
                                                Email: rbuch@tbcwam.com

                                               *Counsel for Debtor*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on October 1, 2020, he filed a copy of the foregoing Notice of Appeal with this Court via the CM/ECF system, which will provide service of that document on all parties of record who receive service via this Court's CM/ECF system.  In addition, on or around October 1, 2020, the undersigned caused a copy of the foregoing Notice of Appeal to be served upon the following individuals via U.S. Mail, first class postage prepaid:

    Jason T Turner
    1705 Mullins Dr
    Cahokia, IL 62206

/s/*Mark T. Lavery*
Mark T. Lavery

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| In re: Jason T. Turner, | Case No.: 19-30993 |
| Debtor. | Chapter 7 |
| | Judge Laura K. Grandy |

**BRIEF IN SUPPORT OF APPEAL OF BANKRUPTCY COURT ORDER DENYING MOTION TO CLOSE CASE OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO PURSUE INTERLOCUTORY APPEAL**

Pursuant to Fed. R. Bank. Proc. 8002, 8003, 8004 and 28 U.S.C. § 158, Deighan LLC, f/k/a Law Solutions Chicago, LLC d/b/a in Illinois as UpRight Law LLC (hereafter referred to as "UpRight Law" or "the Firm") and Debtor(s), Jason T. Turner, have filed a notice of appeal relating to the Bankruptcy Court's denial of the motion(s) to close the above-captioned case. (Doc. 52). As explained below, the Bankruptcy Court's denial of the motion(s) constitutes a "final order" that is immediately appealable. To the extent, however, that this Court concludes it is not a final order, it is nevertheless immediately appealable, both under the collateral order doctrine, and as a motion for an interlocutory appeal pursuant to 28 U.S.C. § 158.

I.      **Introduction and Procedural History**

In addition to filing a notice of appeal in this matter, UpRight Law and the Debtor(s) have filed a motion to withdraw the reference in this case. Appellants incorporate their motion to withdraw in this case by reference, including the procedural background contained at pp. 9-13. To avoid redundancy, Appellants will not fully recite that procedural history, but briefly note the following.

The estate in the instant bankruptcy case was fully administered, without objection, and discharge of debts was entered. Nevertheless, the Bankruptcy Court has refused to close the case—

in derogation of Congress's instruction set forth in 11 U.S.C. § 350(a), and contrary to Rule 5009 and caselaw—based upon an investigation of the business practices of the Firm, as Debtor's counsel, which the Bankruptcy Court is directing the United States Trustee ("UST") to conduct. The investigation in this case is one among approximately 50 investigations that are proceeding in cases filed in this district by the Firm as Debtor's counsel.

Confronted the Bankruptcy Court's refusal to close this case, UpRight Law and the Debtor(s) filed motions to close the instant case. All told, UpRight Law and its clients filed motions to close in 39 cases, only three of which were granted. In each of the 36 cases, including the instant case, the Bankruptcy Court denied the motions to close. In a docket entry dated September 17, 2020, the Bankruptcy Court noted the denial of these motions. (Doc. 52).

## II.     The Bankruptcy Court's Order Denying the Motions to Close Is Immediately Appealable.

The Bankruptcy Court's minute entry denying the Appellants' Motions to Close order is immediately appealable as a final order. [1] To the extent, however, that this Court concludes that it is not a final order, it is immediately appealable under the collateral order doctrine, and as an interlocutory appeal pursuant to 28 U.S.C. § 158.

---

[1] The Bankruptcy Court stated that opinions would be forthcoming in this and other cases in which motions to close had been filed, but as of the filing of the notice of appeal in the instant case, no such opinions had been filed. In addition to attaching the minute Order, Appellants have attached the transcript from the September 16, 2020 hearing.  For purposes of the instant appeal, the docket entry was effective when entered. *See* Fed. R. Bank. Proc. 9021 and 5003 (order was effective when entered); *see also e.g., See Martinez v. City of Chicago,* 499 F.3d 721, 726 (7th Cir. 2007) (even in a case involving a final *judgment*, oral pronouncement with a minute entry was sufficient to give rise to appeal); *Smith-Bey v. Hosp. Adm'r,* 841 F.2d 751, 756 (7th Cir. 1988) ("Finally, we note that the absence of a separate document as required by Rule 58 does not prevent us from exercising jurisdiction over this appeal.").

**A.   The Bankruptcy Court's Denial of the Motions to Close is a "Final Order."**

The standard for appeal from a final order is generally relaxed in bankruptcy matters as opposed to standard civil matters. *See In re Firstmark Corp.,* 46 F.3d 653, 657 (7th Cir. 1995). In assessing finality, courts typically consider whether the order "resolves substantial rights of the parties" in some way. *Id.* at 658. Although there is little case law on the question of whether the denial of a motion to close constitutes a final order, the limited authority on this question has held that it is. *See In re Union Home & Indus., Inc.*, 375 B.R. 912, 915 (B.A.P. 10th Cir. 2007) (denial of a motion to close was a final order because the right to an appeal ultimately would be rendered moot if the order was not immediately appealable). The considerations that led the *Union Home* court to find that the denial of a motion was a final order apply here as well. If the denial of the motions to close cannot be appealed now, they will never be appealable because the issue will become moot if and when the case ultimately is closed (whenever that may be). Moreover, if the case remains open indefinitely, and if it is not currently appealable, there would not be any occasion to seek appellate review of the denial of the motions to close.

**B.   The Bankruptcy Court's Order Is Immediately Appealable Under the Collateral Order Doctrine.**

In the event that this Court concludes that the denial of the motions to close is not a final order, it is nevertheless appealable pursuant to the collateral order doctrine. *See id*. (finding denial of a motion was appealable in the alternative under the collateral order exception). A non-final order may be immediately reviewable under the collateral order exception if the order: (1) conclusively determines a disputed question; (2) resolve an important issue separate from the merits of the action; and (3) if the appellant would suffer irreparable harm if immediate appeal is not granted. *Id*. (*citing Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 430-31 (1985).

These requirements of the collateral order doctrine have been met here. Like the denial of the motion to close at issue in *Union Home*, the Bankruptcy Court's order denying the motions to close conclusively determined the outcome of those motions on a procedural question separate from any issue relating to the merits of the underlying bankruptcy. Moreover, like that case, appellants will suffer irreparable harm if the order is not subject to immediate review. That is because, as explained above, if the order is not reviewable now, it will never become appealable. Moreover, it will also impose irreparable harm on UpRight Law and its clients if an appeal is not permitted. Absent district court intervention, Upright Law will be required to continue to bear the significant expense and disruption associated with the unjustified and burdensome investigatory procedures such as Rule 2004 examinations and document productions in this and other cases. Moreover, as long as these cases remain open, the bankruptcy case will show up as being "open" on the Debtor's credit report. This will adversely impact the availability and cost of credit to the Debtor and will adversely impact their ability to obtain the "fresh start" to which the Debtor is entitled. In short, the requirements of the collateral order doctrine are easily met in this case.

### C. The Order denying case closure is immediately appealable pursuant to 28 U.S.C. § 158.

Pursuant to 28 U.S.C. § 158(a)(3), district courts possess discretion to decide interlocutory appeals from the bankruptcy court without the bankruptcy court's certification of the appeal. *See, e.g., Bullard v. Blue Hills Bank*, 575 U.S. 496, 135 S. Ct. 1686, 1695, 191 L. Ed. 2d 621 (2015); *In re Jartran*, 886 F.2d 859, 865-66 (7th Cir. 1989); *In re Bertoli*, 812 F.2d 136, 139 (3d Cir. 1987). Motions for leave to file an interlocutory appeal under 28 U.S.C. § 158(a)(3) are evaluated using the same § 1292(b) standards as non-bankruptcy cases. *Prologo v. Flagstar Bank, FSB*, 471 B.R. 115, 129 (D. Md. 2012) (citing cases); *Gouveia v. I.R.S.*, 228 B.R. 412, 412-13 (N.D.Ind.1998).

To be appropriate for interlocutory appeal "there must be a question of law, it must be controlling, it must be contestable, and its resolution must promise to speed up the litigation." 28 U.S.C. §1292(b); *Ahrenholz v. Bd. of Trustees of University of Illinois*, 219 F.3d 674, 675 (7th Cir.2000). Where a court rejects an argument that, if accepted, would terminate the proceeding, it is a "natural" for appeal under 28 U.S.C. § 1292(b). *In Matter of Riggsby,* 745 F.2d 1153, 1156 (7th Cir. 1984). This instant appeal involves just such a set of circumstances and is thus a "natural" for appeal under § 158(a) and § 1292(b). *Id.*

> **1.   Immediate appeal is appropriate to consider whether the Bankruptcy Court was required to close this case pursuant to 11 U.S.C. § 350 and Rule 5009, given that the debtor received a discharge, the Chapter 7 Trustee issued his final report, and no party objected to it.**

The primary question presented is:

> Whether the Bankruptcy Court committed reversible error when it denied the Motions to Close the bankruptcy case, despite the fact that the Chapter 7 Trustee issued his final report, no party objected to it, the debtor received a discharge, and the presumption of full administration arose under 11 U.S.C. § 350 and Federal Rule of Bankruptcy Procedure Rule 5009.

Perhaps needless to say, this appeal involves a controlling question of law (whether the court was required to close this case pursuant to § 350 and Rule 5009) that promises to accelerate the proceeding because, if successful, an appeal would end this case. Nor is there any reasonable dispute that the issue is contestable, because the Bankruptcy Court's denial of the motions to close conflicts with extensive authority that interpret § 350 and Rule 5009 to require case closure when the Chapter 7 Trustee issues his final report, and no party objects within 30 days. *See, e.g., In re Wade*, 991 F.2d 402, 406-407 (7th Cir. 1993) (with emphasis added) (the Chapter 7 "*trustee's duties under the law end* with the filing of" his final report of the administration of the estate, and then in turn, "*Chapter 7 cases come to an end in a [trustee's] final report*."). The Bankruptcy Court does not possess discretion to keep cases open in the absence of an objection to the final

report. *See In re Koza*, 375 B.R. 711, 718 (1st Cir. B.A.P. 2007) (emphasis added) ("[t]he responsibility to review the accuracy and correctness of a trustee's final report lies with the U.S. Trustee, see 28 U.S.C. § 586, and the ba*nkruptcy court intervenes only when an objection is filed*. Fed.R.Bankr.P. 5009."); *In re Kelco Metals, Inc*., 532 B.R. 912, 923 (Bankr. N.D. Ill. 2015) (following the trustee's final report certifying full estate administration, "only in light of an objection may the court conclude that the estate is not fully administered."); *see also In re NSCO, Inc.*, 427 B.R. 165, 181-182 (Bankr. D. Mass. 2010) ("The discharge of a bankruptcy trustee relieves him from further obligations under § 704(a). It is a recognition, based on the facts put before the Court in a trustee's final report and final accounting that the case has been fully administered. 11 U.S.C. § 704(a)(9).").

Once the presumption of full administration arises, it is the duty of the bankruptcy court to close the case. *See In re Jordan Mfg. Co., Inc.*, 138 B.R. 30, 33 (Bankr. C.D. Ill. 1992) ("In the cases before this Court, the entry of a final decree under Bankruptcy Rule 3022 is procedural in nature as it involves the "ministerial act" of closing a case after it is fully administered."); *See also, In re Green*, 90 B.R. 560, 561 (Bankr. S.D. Fla. 1988) ("The purely ministerial task of the Clerk to prepare a final decree is the only remaining item in closing this case."); *In re Groves*, 39 F.3d 212, 214 (8th Cir. 1994) (approval of trustee's final account and closure of Chapter 13 case are ministerial tasks); *Alloy Piping Products, Inc. v. Kanzen Tetsu Sdn. Bhd*., 334 F.3d 1284, 1289-1290 (Fed. Cir. 2003) (a "ministerial" act is "one not involving discretion").

The required course of mandatory and non-discretionary events is well-summarized in *McClain v. Branigan*, No. 8:19-cv-01978-PX, 2020 WL 1675988, at *2 (D. Md. April 6, 2020):

> Section 350(a) of the Bankruptcy Code requires the court to close a case when the estate has been fully administered and the Trustee is discharged. The Trustee cannot discharge his duties until filing the report and certifying that the estate has been fully administered. Any objection to the report must be filed within 30 days

thereafter. If no objection is filed, Bankruptcy Rule 5009 provides that the estate is "presumed to have been fully administered." The Bankruptcy Court then discharges the trustee and closes the case.

*Id*. Accordingly, the court in *McClain* rejected a request to reopen the closure of a case, where no objection had been advanced within 30 days after the trustee's final report, and where "no authority" was provided to support any such reopening.

The legally-prescribed sequential events – estate administration, trustee final report, discharge of trustee, and case closure – are to occur expeditiously (and without regard to a vague potential for an "enforcement action" at some unknown future time). *See, e.g., In re Wade, In re Koza, In re NSCO*, and *McClain v. Branigan*, *supra*.

This precept of closing a bankruptcy case as quickly as possible when the prescribed milestones have been reached was articulated expressly in *In re Muldoon*, 2009 WL 161657, *5 (D. Kan. Jan. 23, 2009), quoting 3 Collier on Bankruptcy ¶ 350.02 (Alan N. Resnick & Henry J. Sommer eds.-in-chief, 15th ed. rev.2007). As the court in *Muldoon* stated, "[t]he closing of a case is 'triggered by the filing of the trustee's final report' and likewise should be accomplished as expeditiously as possible." *See also* Fed. R. Bankr. P. 1001 (mandating "[t]hese rules shall be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every case and proceeding.").

> **2. An immediate appeal is appropriate to consider the issue of whether the Bankruptcy Court possesses subject matter jurisdiction to conduct an investigation of UpRight Law.**

The Bankruptcy Court justified its decision to deny closure of these cases based on the investigations of UpRight Law that it has directed the UST to undertake. But the Court lacks jurisdiction to order such investigations, particularly in the context of a case that has been fully

administered.[2] To the extent that these procedures are used as a justification to keep this (and more than 30 other cases) open, considerations of these issues involve contestable legal questions that promise to materially advance this proceeding.

A case or controversy consists of an actual dispute between parties over their legal rights that remain in conflict when the case is presented, and must be a proper matter for judicial decision. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

In this case, there are no conflicting claims of parties brought before the Bankruptcy Court. Neither the UST nor any other person has brought forward any contested matters, adversary proceedings, or other disputed claims against the Firm in this bankruptcy case. Therefore, no "case or controversy" exists.[3]

An important component of the case or controversy doctrine is that courts lack jurisdiction to order generalized investigations relating to a person or counsel. In *Wright v. Baker*, No. 16-12518-PBS, 2018 WL 2077597 (D. Mass. May 3, 2018), the court analyzed the ability of a federal court to conduct an investigation in the absence of a "case or controversy," as follows:

---

[2] It is well-settled that questions pertaining to the Court's subject matter jurisdiction are "controlling questions of law" for purposes of the § 1292(b) analysis. *See, e.g. In re Travelstead*, 250 B.R. 862, 866 (D. Md. 2000) (finding issue relating to Bankruptcy Court's subject matter jurisdiction was a controlling question of law); *In re BS Livingston & Co., Inc*. 186 B.R. 841, 850 (D.N.J. 1995) (same). Reviewing courts have a special obligation to satisfy themselves not only of their own jurisdiction, but also that of the lower courts in a cause under review. . ." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 95 (1998). Moreover, interlocutory appeal is warranted where, as here, the jurisdictional determination will impact numerous cases. *See Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir.1990).

[3] The only contested matter that has been filed in any of these matters related to *In re Potter*, No. 19-60216, which the UST filed on the eve of the September 16, 2020 hearing on the motions to close. It does not relate to this case or the 34 other cases in which motions to close are pending where no adversary proceeding has been filed.

> Article III of the Constitution limits the judicial power of federal courts to deciding actual "Cases" or "Controversies." U.S. Const. art. III, § 2. "In other words, for a federal court to have authority under the Constitution to settle a dispute, *the party before it* must seek a remedy for a personal and tangible harm." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013).
>
> Here, the Court lacks jurisdiction to conduct an investigation of state authorities; the matter presented does not meet Article III's jurisdictional requirement of a case or controversy. *The role of a federal court is to adjudicate disputes presented to it by the parties whose interests are at stake. It does not have jurisdiction to investigate suspicious conduct to see if a dispute exists*.

*Wright* 2018 WL 2077597, at *2 (emphases added). As *Wright* exemplifies, federal courts lack jurisdiction to conduct investigations, on their own stead or through a party, because they are confined to actual cases or controversies before them.

Moreover, courts "are essentially passive instruments of government." *U. S. v. Sineneng-Smith*, ––– U.S. –––, 140 S. Ct. 1575, 1579 (2020). They "do not, or should not, sally forth each day looking for wrongs to right. [They] wait for cases to come to [them], and when [cases arise, courts] normally decide only questions presented by the parties." *Id*. Here, by holding cases open that are required to be closed, for purposes of its own investigation of the Firm, the Bankruptcy Court is acting without a "case or controversy" among parties and thus outside of its prescribed jurisdiction. The "case or controversy" requirement applies to bankruptcy courts, as they are units of Article III district courts, *In re Aloia*, 496 B.R. 366, 377 (E.D. Pa. 2013) (citing cases), and "[a] live controversy must exist at every state of the litigation." *Payne v. Progressive Fin. Servs., Inc.*, 748 F.3d 605, 607 (5th Cir. 2014). Accordingly, the investigation ordered by the Bankruptcy Court does not qualify as a "case or controversy" necessary to satisfy Article III § 2.

3. **An immediate appeal is appropriate to resolve the issue of whether holding the case open violates UpRight Law's Due Process and Equal Protection Rights.**

It is a violation of the Firm's and the Debtor's equal protection and due process rights for the Bankruptcy Court to selectively deploy unfair investigatory procedures against the Firm, and to rely upon those very procedures as grounds to not close this bankruptcy case. Because a determination that these procedures violate equal protection and/or due process would defeat the Bankruptcy Court's reliance on them as a justification for keeping this and other cases open, they

represent controlling questions of law that promise to materially advance the litigation. Nor is there any question that these questions present contestable issues of law.

Under the Fifth and Fourteenth Amendments to the Constitution, the government must respect all legal rights that are owed to a person. The required elements of due process are those that "minimize substantively unfair or mistaken deprivations" of life, liberty, or property, by enabling persons to receive notice of and to contest the basis upon which a state actor proposes to deprive them of protected interests. *Carey v. Piphus*, 435 U.S. 247, 259 (1978). The core of these requirements is notice and a fair hearing before an impartial tribunal. *See, e.g., Montgomery v. Uchtman*, 426 F.3d 905, 910 (7th Cir. 2005) ("The Due Process Clause guarantees litigants an impartial judge."); *Zolotukhin v. Gonzales*, 417 F.3d 1073, 1075 (9th Cir. 2005) ("A neutral judge is one of the most basic due process protections."); *In re L.T. Ruth Coal Co., Inc.*, 66 B.R. 753, 782 (Bankr. E.D. Ky. 1986) ("bankruptcy court is a passive, impartial arbiter rather than an active participant in [] controversies that may involve vindication of rights that arise under federal law").

In this case, the Bankruptcy Court's directive to the UST to investigate UpRight Law is inconsistent with its obligation to serve as a neutral arbiter of a dispute among parties. By conceiving of an investigation against the Firm in a case with a fully-administered estate, and by instructing a government actor to conduct the investigation at its bidding, the Bankruptcy Court is acting more in the nature of a party-advocate against the Firm, and is drawing conclusions about this case without a fair process by which the Firm can defend itself. Among other things, due process is violated because the Firm has not received adequate notice of any claims asserted against it.[4] *See generally* Fed. R. Civ. P. 8; *Bell Atl. Cor. v. Twombly*, 550 U.S. 544 (2007); and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

_____

[4] To the extent that the investigation is characterized as an examination of UpRight Law's fees, the UST's guidelines that require Chapter 7 trustees to review the attorney fees in the first instance, with the oversight of the UST that is conferred through her ability to file objections with 30 days of the final report. The UST filed no such objection in this case. In *In re Ingersoll*, the district court remarked that the Standing Chapter 13 trustee should be the party to review fee applications in Chapter 13 cases, in order to avoid the development of an adversarial relationship between the bankruptcy judge and the applying attorney. *See In re Ingersoll,* 238 B.R. 202, 209

With respect to the Equal Protection Clause, equal protection forces a state actor to govern impartially, and not draw distinctions between persons that are not relevant to a legitimate governmental objective. In this case, the Bankruptcy Court is applying attorney fee review procedures selectively, only as to UpRight Law. *See Matter of Geraci*, 138 F.3d 314, 321 (7th Cir. 1998) (recognizing that if bankruptcy court's presumptively reasonable fee analysis applied only to single law firm, it would violate equal protection rights of firm).

The primary mechanisms used by the Bankruptcy Court for its investigatory procedures are *sua sponte* notices of hearings for attorney fee reviews, and oral examinations under Rule 2004. However, the Firm is not aware of any other debtor's counsel in this district who have been made to endure these procedures. Respectfully, the Bankruptcy Court's selective application of these processes constitutes differential treatment of both the Firm and its clients, without a rational basis. *See, e.g. Frederickson v. Landeros*, 943 F.3d 1054, 1060 (7th Cir. 2019) (recognizing equal protection theory where government actors have singled out an individual lacking rational basis); *U.S. v. Windsor*, 570 U.S. 744, 776 (2013) (equal protection rights incorporated within Fifth Amendment's Due Process Clause).

Further, Debtors have a basic right to counsel of their choosing. *See, e.g. In re Diamond Mortg. Corp. of Illinois,* 135 B.R. 78, 92 (Bankr. N.D. Ill. 1990) ("We believe that by allowing the debtor's counsel to continue in its representation, we are bolstering the public image of the legal system by ensuring a party's right to choose counsel. . . ." ). The holding open of Debtor(s)' case past the prescribed time to close pursuant to 11 U.S.C. § 350 or Rule 5009 violates their equal protection rights by treating them differently than other debtors in the bankruptcy system purely based on their selection of counsel. Stated differently, Debtor(s)' bankruptcy case is being held open for reasons that do not relate to their right to a discharge or the administration of the

---

(D. Colorado 1999). Here, neither the UST nor the Bankruptcy Court have followed procedures that place this responsibility on the Chapter 7 trustee in the first instance, and as a result have placed UpRight Law in the unfortunate and unfair position of existing in an apparently adversarial relationship with the Bankruptcy Court. Given that due process requires a neutral arbiter, this dynamic is highly problematic.

bankruptcy estate , but instead, to facilitate an investigation of their chosen counsel.  This is prejudicial to these debtors' ability to obtain the "fresh start" to which they are entitled, as it adversely affects, among other things, the cost and availability of credit to them.

In addition, the Rule 2004 examinations are violative of due process and equal protection because, while they are held out as justification for continuation of the investigation, their deployment here conflicts with the rule. Rule 2004 simply does not permit the investigation of third parties that are not related to the Debtor's conduct or the bankruptcy estate. *See In re Martelli,* No. BR 16-20316-PRW, 2017 WL 3098105, *3 (Bankr. W.D.N.Y. July 20, 2017) (forbidding examinations under Rule 2004 whose true intent was "to develop evidence of misconduct by UpRight Law and [its local partner]."); *In re Wilcher*, 56 B.R. at 434 ("Rule 2004 may not be used as a device to launch into a wholesale investigation of a non-debtor's private business affairs.").[5]

Finally, Rule 2004 may not be used where, as here, the estate is fully administered. *See, e.g., In re Hilsen*, No. 87-11261, 2008 WL 2945996, at *5 (Bankr. S.D.N.Y. July 25, 2008) ("Discovery of any matter that may affect administration of a debtor's estate only makes sense while estate administration still is in progress. … [Rule 2004] is procedurally inapplicable when there is nothing to discover about current estate administration and when no activity in a case is required other than to close it.").

## CONCLUSION

UpRight Law respectfully requests that this Court hear UpRight Law's appeal, either as a matter of right pursuant to Fed. R. Bankr. Proc. 8003, or as permitted under Fed. R. Bankr. Proc. 8004. Further, UpRight Law asks that this Court, as resolution of the appeal, issue an Order

---

[5] *See also In re Underwood*, 457 B.R. 635, 646 (Bankr. S.D. Ohio 2011) ("[A] 2004 exam is simply not an appropriate tool for obtaining a broad range of information from a non-debtor that is not relevant to the debtor or her estate."); and *In re French*, 145 B.R. 991, 993 (Bankr. D. S.D. 1992) ("there is something repugnant in requiring an attorney to submit to a Rule 2004 examination, especially when debtor's counsel is the sought-after target.").

closing the case and terminating any and all ongoing procedures,[6] or Order the matter remanded to the Bankruptcy Court for substantially similar relief.

Date: October 1, 2020                                   Respectfully Submitted,

                                                        /s/ *Mark T. Lavery*
                                                        Mark T. Lavery
                                                        Attorney at Law
                                                        8926 N. Greenwood, #115
                                                        Niles, IL 60714
                                                        (312) 792-9533
                                                        laverylawyer@gmail

                                                        Charles A. Armgardt
                                                        Of Counsel
                                                        UpRight Law LLC
                                                        79 W. Monroe St.
                                                        Chicago, IL 60603
                                                        877-927-5451
                                                        carmgardt@uprightlaw.com

                                                        *Counsel for Deighan Law d/b/a UpRight Law LLC*

                                                        Ronald Buch
                                                        5312 West Main
                                                        Belleville, IL 62226
                                                        Phone: (618)236-7000
                                                        Email: rbuch@tbcwam.com

                                                        *Counsel for Debtor*

---

[6] Including, but not limited to, the 2004 exams which the UST has sought in this matter as part of the improper 'investigation' of UpRight Law.

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was served upon all counsel of record via CM/ECF filing system and to the debtor listed below via regular first-class mail, proper prepaid postage and deposited at a U.S. Mailbox in Chicago, Illinois on or about October 1, 2020:

Jason T Turner
1705 Mullins Dr
Cahokia, IL 62206

/s/*Mark T. Lavery*
Mark Lavery

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

UNITED STATES TRUSTEE

**vs**

| | |
|---|---|
| **CASE NO** | 19-30993 |
| **CHAPTER:** | 7 |

JASON TURNER; RON BUCH

**DATE**:  September 16, 2020
**PLACE**:  East St Louis

---

**PRESENT**:  Honorable Laura K. Grandy, US Bankruptcy Judge

**COUNSEL FOR PLAINTIFF**:  Mark Skaggs                          Appears

**COUNSEL FOR DEFENDANT:**  Ron Buch                          Appears

Charles Armgardt                          Appears

**PROCEEDINGS:**  1) Objection to Motion to Close Case
2) Objection to Motion to Close Case

**MINUTES OF COURT:**

Case is called for hearing on the United States Trustee's Objections to the debtor's Motion to Close Case and Ron Buch's Motion to Close Case. Pursuant to the statements made in open court, the Objections are Sustained and the Motions to Close Case are Denied. Order to enter. Ron Buch is granted 30 days to file an Itemization of Fees. Failure to file the Itemization of Fees within the time allotted may result in this Court taking any other action deemed appropriate.

Donna Beyersdorfer
Clerk of Bankruptcy Court

By:  /s/Jacob Friederich
Deputy Clerk

**NOTE:  THESE WRITTEN MINUTES ARE A CLERICAL ENTRY OF THE COURT PROCEEDINGS FOR  RECORD KEEPING PURPOSES ONLY. THEY ARE NOT AND SHOULD NOT BE CONSTRUED AS THE ORDER OF THE COURT, WHICH WAS ORALLY DELIVERED.  CONSULT THE TRANSCRIPT OF  PROCEEDINGS FOR THE ACTUAL ORDER.**

```
                 UNITED STATES BANKRUPTCY COURT
                   SOUTHERN DISTRICT OF ILLINOIS


IN RE:                      .     Case No. 18-60241-LKG
                            .
RICHARD DONALD DAVIS,       .     Melvin Price Federal Building
JR. AND JEANETTE GAY        .     750 Missouri Avenue
DAVIS,                      .     East St. Louis, IL 62201
           Debtors.         .
. . . . . . . . . . . . . . .
IN RE:                      .     Case No. 20-30807-LKG
                            .
SHIRLEY PHILLIPS,           .
                            .
           Debtor.          .
. . . . . . . . . . . . . . .
IN RE:                      .     Case No. 19-60216-LKG
                            .
CHELSEA LYNNE POTTER,       .
                            .
           Debtor.          .
. . . . . . . . . . . . . . .
IN RE:                      .     Case No. 18-60382-LKG
                            .
KRISTYN M. CURRY,           .
                            .
           Debtor.          .
. . . . . . . . . . . . . . .
IN RE:                      .     Case No. 19-40180-LKG
                            .
SANDRA K. DENNIS,           .
                            .
           Debtor.          .
. . . . . . . . . . . . . . .
IN RE:                      .     Case No. 19-40714-LKG
                            .
THOMAS PAUL SCHNUCK AND     .
CHRISTY KAYE SCHNUCK,       .
                            .
           Debtors.         .
. . . . . . . . . . . . . . .
IN RE:                      .     Case No. 19-60222-LKG
                            .
WENDALL B. HAWS,            .
                            .
           Debtor.          .
. . . . . . . . . . . . . . .
```

```
IN RE:                          .    Case No. 19-60349-LKG
                                .
BOYCE ALLEN BURNS AND           .
AMANDA LANE BURNS,              .
                                .
           Debtors.             .
. . . . . . . . . . . . . . .
IN RE:                          .    Case No. 20-40036-LKG
                                .
BETTY A. COREY,                 .
                                .
           Debtor.              .
. . . . . . . . . . . . . . .
IN RE:                          .    Case No. 20-40166-LKG
                                .
BRANDI S. HILL,                 .
                                .
           Debtor.              .
. . . . . . . . . . . . . . .
IN RE:                          .    Case No. 20-40179-LKG
                                .
ANDREA L. LINDSEY AND           .
JASON L. LINDSEY,               .
                                .
           Debtors.             .
. . . . . . . . . . . . . . .
IN RE:                          .    Case No. 20-40199-LKG
                                .
CULLEN J. BOND,                 .
                                .
           Debtor.              .
. . . . . . . . . . . . . . .
IN RE:                          .    Case No. 20-60025-LKG
                                .
JOHN A. SMILEY,                 .
                                .
           Debtor.              .
. . . . . . . . . . . . . . .
IN RE:                          .    Case No. 20-30103-LKG
                                .
JEFFREY S. THULIN AND           .
JULIE BAYLES THULIN,            .
                                .
           Debtors.             .
. . . . . . . . . . . . . . .
```

```
IN RE:                          .    Case No. 19-30157-LKG
                                .
KERRI LYNN SIERRA SCOTT,        .
                                .
          Debtor.               .
. . . . . . . . . . . . . . ..
IN RE:                          .    Case No. 19-30720-LKG
                                .
MARC J. CLARK AND               .
KELLY JO CLARK,                 .
                                .
          Debtors.              .
. . . . . . . . . . . . . . ..
IN RE:                          .    Case No. 19-30856-LKG
                                .
ARIEL VICTORIA MOUNCE,          .
                                .
          Debtor.               .
. . . . . . . . . . . . . . ..
IN RE:                          .    Case No. 19-30905-LKG
                                .
HAROLD F. LALUMONDIERE          .
AND LISA A. LALUMONDIERE,.
                                .
          Debtors.              .
. . . . . . . . . . . . . . ..
IN RE:                          .    Case No. 19-30993-LKG
                                .
JASON T. TURNER,                .
                                .
          Debtor.               .
. . . . . . . . . . . . . . ..
IN RE:                          .    Case No. 19-31097-LKG
                                .
DONALD G. LANKFORD,             .
                                .
          Debtor.               .
. . . . . . . . . . . . . . ..
IN RE:                          .    Case No. 19-31273-LKG
                                .
MEGAN NICOLE BECKEMEYER,        .
                                .
          Debtor.               .
. . . . . . . . . . . . . . ..
IN RE:                          .    Case No. 19-31377-LKG
                                .
DAVID ANTHONY MILLER,           .
                                .
          Debtor.               .
. . . . . . . . . . . . . . ..
```

```
IN RE:                          .    Case No. 19-31474-LKG
                                .
JAMIE L. BRUCKER AND            .
ANGELA JANE BRUCKER,            .
                                .
          Debtors.              .
. . . . . . . . . . . . . .
IN RE:                          .    Case No. 19-31476-LKG
                                .
ARNOLD T. EDWARDS AND           .
TRACY D. EDWARDS,               .
                                .
          Debtors.              .
. . . . . . . . . . . . . ..
IN RE:                          .    Case No. 19-31537-LKG
                                .
RACHAEL M. HOHENSEE,            .
                                .
          Debtor.               .
. . . . . . . . . . . . . ..
IN RE:                          .    Case No. 19-31596-LKG
                                .
TIFFANY L. CANNON,              .
                                .
          Debtor.               .
. . . . . . . . . . . . . ..
IN RE:                          .    Case No. 19-60152-LKG
                                .
ROSS EVERETT VANDEVENTER        .
AND MARY RUTH                   .
VANDEVENTER,                    .
                                .
          Debtors.              .
. . . . . . . . . . . . . .
IN RE:                          .    Case No. 19-60320-LKG
                                .
ALBERT DEAN JOHNSON, II,        .
                                .
          Debtor.               .
. . . . . . . . . . . . . .
IN RE:                          .    Case No. 20-30177-LKG
                                .
PEGGY CHAPMAN,                  .
                                .
          Debtor.               .
. . . . . . . . . . . . . ..
```

```
IN RE:                          .    Case No. 20-30186-LKG
                                .
ANGIE M. McCLATCHERY,           .
                                .
          Debtor.              .
. . . . . . . . . . . . . ..
IN RE:                          .    Case No. 20-30203-LKG
                                .
SHAUNE K. SCRUGGS AND           .
MICAH T. SCRUGGS,               .
                                .
          Debtors,             .
. . . . . . . . . . . . . ..
IN RE:                          .    Case No. 20-30828-LKG
                                .
JARIAN STIFF AND MONICA         .
STIFF,                          .
                                .
          Debtors,             .
. . . . . . . . . . . . . ..
IN RE:                          .    Case No. 19-30087-LKG
                                .
TERRY DEDMON AND KHRISTIE       .
GABLE,                          .
                                .
          Debtors,             .
. . . . . . . . . . . . . ..
IN RE:                          .    Case No. 19-31602-LKG
                                .
CLINTON JONES AND               .
PAMELA JONES,                   .
                                .
          Debtors,             .
. . . . . . . . . . . . . ..
IN RE:                          .    Case No. 19-60357-LKG
                                .
THERESA REYNOLDS,               .
                                .
          Debtor,              .
. . . . . . . . . . . . . ..
IN RE:                          .    Case No. 20-30346-LKG
                                .
GEORGE WISE,                    .
                                .
          Debtor,              .
. . . . . . . . . . . . . ..
```

6

```
IN RE:                    .    Case No. 20-40187-LKG
                          .
ANNETTE CROW AND          .
CHARLES CROW,             .
                          .
          Debtors,        .
. . . . . . . . . . . ..
IN RE:                    .    Case No. 20-40288-LKG
                          .
DARRELL KULIK,            .
                          .
          Debtor,         .    September 16, 2020
. . . . . . . . . . . ..       9:00 a.m.
```

   TRANSCRIPT OF HEARING ON OBJECTIONS TO MOTIONS TO CLOSE CASE
    AND STATUS HEARING RE: DISCLOSURE OF ATTORNEY COMPENSATION
                  BEFORE HONORABLE LAURA K. GRANDY
           UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

TELEPHONIC APPEARANCES:

```
For UpRight Law LLC,      Deighan Law LLC dba UpRight Law LLC
Ronald Buch, James Ford,  By:  CHARLES ARMGARDT, ESQ.
Eric Homa:                79 W. Monroe, 5th Floor
                          Chicago, IL 60603


For the Debtors:          UpRight Law LLC
                          By:  RONALD ALLAN BUCH, ESQ.
                               JAMES FORD, ESQ.
                               ERIC HOMA, ESQ.
                          5312 W. Main Street
                          Belleville, IL 62226


For the U.S. Trustee:     Office of the U.S. Trustee
                          By:  MARK SKAGGS, ESQ.
                          Becker Building, Room 1100
                          401 Main Street
                          Peoria, IL 61602


Audio Operator:           Cathy Hart
```

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:   jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

7

1         COURTROOM DEPUTY:  Docket Number 4, Shirley Phillips.

2         MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

3         MR. ARMGARDT:  Good morning, Your Honor.  This is

4    Charles Armgardt for UpRight Law and Ron Buch.

5         MR. BUCH:  And Ron Buch for Ms. Phillips.

6         THE COURT:  Okay.  On this particular case, we have a

7    status hearing regarding disclosure of attorney compensation.

8    And we note from reviewing the statement of financial affairs

9    that UpRight was paid $1,775 over a period of just a little

10   over four months, January 2019 through May 24th, '19.  But the

11   case was not filed until about 15 months later, August 21st,

12   2020.  And during that period, the debtor Shirley Phillips was

13   subject to a small claims action filed by Portfolio Recovery

14   Associates.

15        So what I'd like to have done in this case is I'd

16   like the standard fee statement that you've been filing to be

17   filed, Mr. Buch, within 30 days.

18        MR. BUCH:  Sure.  That'll be fine.  Thank you, Judge.

19        THE COURT:  Okay, thank you.

20        All right.  Next case, please.

21        COURTROOM DEPUTY:  Docket Number 5, the United States

22   Trustee versus Chelsea Potter and Eric Homa.

23        MR. SKAGGS:  Mark Skaggs for the United States

24   Trustee.

25        MR. ARMGARDT:  Charles Armgardt for UpRight Law and

1  Eric Homa.

2          MR. HOMA:  Eric Homa for Ms. Potter.

3          THE COURT:  Okay.  We have today two motions to

4  close, one filed by the U.S. Trustee against Eric Homa and --

5  actually, a motion to close filed by Eric Homa and a motion to

6  close by the debtors and objections filed by the Trustee in

7  each of those motions.

8          I have reviewed the various briefs that were filed in

9  the other cases.  Is there anything the Trustee or Mr. Armgardt

10 or Mr. Homa, you would like to add to this case to your

11 argument?

12         MR. ARMGARDT:  Yes, Your Honor.  If I may?

13         THE COURT:  Okay.

14         MR. ARMGARDT:  Yes.  In this case and, indeed, with

15 respect to the other 29 cases that are similarly situated in

16 this posture motions to close, the Court is urged to --

17 respectfully urged to grant UpRight's and the debtors' motion

18 to close the case.  11 U.S.C. Section 350 requires that a

19 bankruptcy case be closed expeditiously when the estate is

20 fully administered and the Court has discharged the trustee.

21         In this case, we have a set of undisputed facts, and

22 they include the following.  First, the Chapter 7 Trustee filed

23 a report certifying full administration of this estate and he

24 did so very, very long periods of time ago long before the

25 motion to close was filed.

1    Secondly, neither the United States Trustee or, for

2    shorthand, UST nor any party in interest filed an objection to

3    the Trustee's final report of full administration of the estate

4    within the time to do so, which pursuant to Federal Rule of

5    Bankruptcy Procedure 5009 was within 30 days after the

6    Trustee's report was filed.

7    Number three, no counter facts have been advanced to

8    show that this estate is not fully administered. And, four,

9    there are no further obligations for the Chapter 7 Trustee to

10   fulfill. All of the statutory responsibilities under 11 U.S.C.

11   Section 704, including review of the attorney fee charge by

12   debtors' counsel have been completed. As a matter of law then,

13   or in other words, by operation of law, these undisputed facts

14   fall upon the Court to discharge the Trustee and to close the

15   case. As the Seventh Circuit stated in In re Wade, 991 F.2d at

16   406-407: "Trustee's duties under the law and with the filing of

17   the final report." "Chapter 7 cases come to an end in a final

18   report."

19   And so, similarly, as the First Circuit Bankruptcy

20   Appellate Panel held in In re Koza, and that's 375 B.R. 717,

21   where this set of undisputed facts exist, a bankruptcy court is

22   to proceed to undertake the "ministerial act of closing the

23   case." A ministerial act is one that does not involve

24   discretion. It involves adherence to instructions and act that

25   is performed as a matter of law when a given state of facts

1  exist and in a prescribed manner.  And here, we submit, that

2  the instruction is set forth in 11 U.S.C. Section 350(a).

3        And so this is very much like the context of Rule 56

4  under the Federal Rules of Civil Procedure where summary

5  judgment must be granted when the material facts are undisputed

6  and when a result is to occur by operation of law.  And that's

7  what we have here.  We submit that this means that there simply

8  is no room for general theorizing about authority to review

9  fees or supervise counsel or for speculations about the

10  movant's motivations or for not closing the case based on the

11  UST's vague inclination that it might in the future commence a

12  so-called enforcement action in this case -- in some case but

13  not necessarily this case, the Potter case.

14        Courts do not deny well-formulated summary judgment

15  motions on grounds that what the defendant really wants is

16  dismissal of the claims or on the basis of what the responding

17  party might do in the future.  That's nonsensical.

18        We respectfully submit that there's also no room for

19  post-hoc engineering or manipulation of Chapter 7 Trustee

20  discharge as a means to circumvent Section 350(a).  As a matter

21  of law, the Trustee is to be discharged when his statutory

22  functions have been completed, and that occurred in this case

23  long ago.  Conversely, not discharging the Trustee is simply

24  not proper.  Any investigation of UpRight's fees or conduct in

25  this case is not related to any function of the Chapter 7

1  Trustee, and unfulfilled function, that is.

2        The Chapter 7 Trustee administered the case, the

3  estate.  Neither he nor the UST took any timely action with

4  regard to the attorney's fees or anything else and now the

5  estate is fully administered.  The Chapter 7 Trustee's

6  statutory duties are completed.  So, again, any investigation

7  here is not material to the issue of closing the case under

8  Section 350(a).

9        Now, meanwhile, the case law informs us that a

10  bankruptcy court might only get involved on the filing of an

11  objection to full estate administration, but there was no

12  objection in this case.  So, therefore, this case nor the other

13  ones can be prolonged by the device of not discharging the

14  Trustee in order to sidestep the "shall close the case" command

15  that's contained in Section 350(a).

16        Now it's telling that the UST has cited no authority

17  which provides or even suggests that that kind of construct is

18  lawful and proper procedure, and I will discuss that more in a

19  moment when I address the UST's response to the reply brief

20  submitted by UpRight Law and the debtors.

21        But, first, there are severe repercussions from not

22  closing this case in derogation to Section 350(a).  There's

23  harm and prejudice for the debtors through delay or worse, to

24  their fresh start.  They should not be made to suffer damage

25  from this procedure.  Now, notably, in the movant's reply

1   briefs, we discussed and believe established that the debtors

2   are suffering harm from their ability to re-establish their

3   creditworthiness and, thus, to their fresh start.  We showed

4   that by their cases remaining open, the debtors' credit scores

5   are likely being impaired negatively by these proceedings.

6           And there was no real rebuttal to that in the UST's

7   responses to the reply.

8           THE COURT:  But I don't know if there were any real

9   facts supporting that either, but go on.

10          MR. ARMGARDT:  Thank you, Your Honor.  Well, what the

11  rebuttal was, it was an unsubstantiated statement that the

12  movant showing rings hollow.  Well, there really was no

13  substantive opposition on that question by the UST, and so we

14  would submit that in reality, it's the supported conclusion as

15  the UST that rings hollow.

16          Now that's particularly true in light of how stale

17  these cases are.  The Potter case was filed on June 18, 2019.

18  And that was about 15 months ago.  And other cases were filed

19  as long as 700 days ago.  And the average amount of time before

20  today when this petition's in the 30 cases that we're scheduled

21  on the Court's schedule on the website for today, the average

22  amount of time ago when those petitions were filed is over a

23  year ago, 371 days or so.

24          Also, the time when these cases, including this

25  Potter case, became properly closeable under Section 350(a) and

1 Rule 5009 and normal case administration and that would be the

2 date 30 days after the Trustee's final account or the date of

3 discharge of the debts order, whichever is later, similarly

4 occurred very, very long period of time ago. In this Potter

5 case, it was about 151 days ago, about 5 months ago. In other

6 cases, for example, Ms. Curry's case, it was ripe for closing

7 over 20 months ago.

8        Similarly, the time for the UST to object to full

9 administration of the estate expired an average of

10 approximately eight months ago in these 30 cases. In this

11 Potter case, it was five months ago. And, yet, seriously, I

12 would say all of the talk of time gaps in these cases has been

13 one-sided, focused on UpRight Law.

14        So we respectfully submit that all of this is very

15 unfair to the debtors and their counsel. The circumstances

16 really -- I don't believe can fairly be deemed non-prejudicial

17 to the debtors or their counsel. And now, importantly, while

18 these cases have lingered around for these long periods of

19 time, this isn't due to the conduct of the debtors or their

20 counsel. We've undertaken all manner of work by this Court's

21 deadline. These include submitting the statements of work,

22 like what was ordered in the Phillips case a little while ago,

23 producing documents, providing 2004 exams. And, yes, while the

24 movants have lodged objections to various motions of the UST,

25 in no case have we asked for or been granted any stays on

1  proceedings and in only very rare circumstances and instances

2  that we ask for even short extensions of time.

3        So what I believe we have are, respectfully,

4  investigations that are limitless and rutterless.  UpRight Law

5  and the partner attorneys are in a sort of functional purgatory

6  where they face extreme -- extremely expensive and

7  (indiscernible) processes and hearings but there are no

8  articulated allegations against them in a pleading.  They don't

9  have any practical ability to seek to resolve any of this.

10  There's no one to settle with.  There's no action that seems

11  possible to be taken to settle even by agreeing to reduce fees.

12        Respectfully, we submit this is not just.  And,

13  further, as laid out in the motion and the reply briefs, the

14  state of affairs is violating, we believe, the due process, any

15  protection rights of UpRight Law, the partner attorneys, and

16  the debtors.

17        Now at the same time, we know from the excusal -- Mr.

18  Skaggs''s failure to file timely objections to the motions to

19  close in several of the cases, including Megan Beckemeyer's

20  case, that perfection by counsel is not the standard which

21  governs.  But, of course, the main issue here is the operation

22  of 11 U.S.C. Section 350(a).  And so let me now address in more

23  detail the UST's responses to the movant's reply briefs.

24        The central point of the UST's responses, including

25  in the Potter case, is that notwithstanding the clear "shall

1  close the case" command in Section 350(a), the Court should not

2  do so here because it is UpRight Law and the debtors who are

3  asking for it.  Well, that's a remarkable argument considering

4  that Section 350(a) does not say "on motion, the court shall

5  close the case when the conditions are met."  Indeed, no

6  language in Section 350(a) suggests that the "shall close the

7  case" command comes into play, fruition only if a court is

8  asked to close the case by motion.  And, certainly, 350(a) does

9  not say anything remotely similar to what the UST's argument is

10 here, which is that the Court shall close the case only if it

11 is asked to do so by someone whom the UST deems is worth of

12 being heard.  That the Court cannot close the case, that to do

13 so by some sort of disfavored person or hear persons who might

14 be held with circumspection by the UST.

15      Section 350(a) is clear and plain direction to the

16 bankruptcy court independent of a motion or other extraneous

17 factors.  And so it's worth noting that this type of contention

18 by the UST, which is that a court may disregard the "shall

19 close the case" command in Section 350(a) because UpRight Law

20 and the debtors, UpRight Law's clients who are asking the Court

21 for case closure, well, that really underscores that real merit

22 and their intentions of due process and equal protection

23 (indiscernible).  The contention of the UST shows that the

24 movants are singled out for disparate treatment.

25      Now, UST contends in support of her central point

1 that she did not find any reported cases involving a debtor

2 moving to close a case in what she characterized as

3 (indiscernible) a defensive weapon. But I would submit that

4 that's unpersuasive for several reasons, Your Honor.

5 First is Section 350(a) itself, its language does not

6 require a motion. The second reason is most likely explanation

7 for the UST's stated ability -- inability to find any reported

8 cases involving a debtor moving a court to close a case is that

9 procedures being used in the cases that are here have not --

10 (indiscernible) have not happened before. They appear to be

11 unprecedented in delaying case closure and imposing the

12 enormous burdens on debtors and their counsel for purposes of

13 an investigation. It appears debtors and their counsel have

14 not had (indiscernible) to move for Court's closure. But this

15 Court closed cases expeditiously and ministerially when the

16 statutory conditions exist, as the law prescribes.

17 And then, thirdly, in any event, reported cases do

18 exist in fact in which a debtor had moved a court to close

19 their case under Section 350. And this is not withstanding the

20 UST's ability to find them. In the case of In re Necaise, 443

21 B.R. 483, it's a 2010 case, for example, a motion to close a

22 bankruptcy case was made by a debtor in a Chapter 11 case on

23 the basis of 350(a) -- Section 350(a), and it was granted.

24 And then in a case cited by the Bankruptcy Appellate

25 Panel in the Tenth Circuit, In re Union Home Industrial Inc.,

1  375 B.R. 912, it's a 2007 case, the debtor in a Chapter 11 case

2  also moved the bankruptcy court to close the case.  And in

3  addressing case closure there, neither the bankruptcy court nor

4  the appellate court said anything even remotely of a rule or a

5  basis to say that a debtor or her counsel may not invoke

6  Section 350(a) in a so-called offensive application which is

7  how the UST here characterizes it.

8          Rather, Tenth Circuit considered the motion to close

9  strictly in terms of whether the statutory conditions for case

10 closure were met.  Now, ultimately, in that case, the court,

11 Tenth Circuit denied the motion to close based on the fact that

12 the estate was not yet fully administered because the debtor in

13 possession and an accountant had not yet submitted their fee

14 applications and their time to do so had not yet expired.  And,

15 thus, under those facts, unlike the facts in the Potter case

16 and the other cases that are here this morning, the case was

17 not ripe for closure under Section 350(a).

18         Then another case involving a debtor's motion to

19 close, which was denied due to the facts there showing the

20 estate was not fully administered was In re Swiss Chalet, Inc.,

21 485 B.R. 47, a 2012 case.  The significance of these cases is

22 that the fundamental premise of the UST's opposition to the

23 application of Section 350(a) to these cases, which again is

24 that it's unlawful procedure for debtors and their counsel to

25 invoke Section 350(a), it's without merit.  There's quite

18

simply no case that I'm aware of, that we're aware of, says anything of the sort, nor would a case say that. Again, Section 350(a) operates as a direction to the bankruptcy court regardless of whether anyone asks for case closure and no matter who asks for it.

And now equally to the point, no case cited by either side supports the non-closure of a bankruptcy case despite the statutory conditions being met in order to accommodate the completion of an investigation. The UST's responses did not address, much less attempt to distinguish the one case cited by either side -- we cited in the reply brief -- that included that fact pattern. This was the case of In re NSCO, Inc., 427 B.R. 165 from last -- well, this year, 2020.

In that case, the bankruptcy court refused to hold a bankruptcy case open in order to permit an investigation. In that case, it was a Department of Labor investigation of an employee benefit plan. There was not a lot of discussion of that point, but that was the result in the case, stated explicitly. So instead, the UST's responses deflect with a citation to In re Wildman, 72 B.R. 700, a 1987 case, for the proposition that the: "court has inherent and statutory authority to examine fees and to regulate the performance of attorneys."

Well, fair enough, but the examination in Wildman took place during the case, during the process of estate

1 administration, not long after the trustee's report, final

2 report of full administration, which are the facts here.  And

3 the review in <u>Wildman</u> was a fee award request that was

4 submitted under Section 330 by counsel for the trustee in a

5 Chapter 11 case.  There was no Section 350(a) issue at all in

6 the case.  And so <u>Wildman</u> is not precedented for the non-

7 closure of this no- or low-asset Chapter 7 case or any of the

8 other cases where the Section 350(a) conditions exist in order

9 to accommodate an investigatory examination of fees or conduct.

10      And none of the other cases cited by the UST support

11 that a court may choose to not follow Section 350(a) for an

12 investigation or any other reason extraneous to the plain

13 language of Section 350(a).  The main case cited in the

14 objections by the UST was <u>In re DeShetler</u>, 453 B.R. 295, a 2001

15 case.  And the U.S. Trustee in that case wasn't permitted to

16 make preliminary inquiries before determining if an objection

17 is warranted, but all of that activity took place before the

18 completion of estate administration by the trustee and before

19 the 30-day period of time to object to the trustee's final

20 report under Rule 5009.

21      These preliminary inquiries in <u>DeShetler</u> did not

22 occur long after these events and certainly didn't occur as

23 long as five months or as long as a couple of years after those

24 milestones, such as we have in these cases.

25      The other main case cited by the U.S. trustee is <u>In</u>

1  re Sweports, Limited, 777 F.3d 364. But it's also not

2  precedent for a lengthy and broad roving commission into

3  debtor's counsel in a long-past full administration case. The

4  case had nothing to do with the reasonableness of fees or with

5  regulation of counsel's conduct.

6         Under the facts that we have here in the Potter case

7  and the other cases at bar, the Chapter 7 Trustee undertook his

8  job and he completed it. And so now the cases are to be

9  closed. There's an illustration of that in the case of In re

10  Carvalho, 578 B.R. 1. It's a 2017 case. And the court in

11  Carvalho explained that under the law, the chapter trustee is

12  granted wide authority and discretion regarding his chosen

13  methods of administrating the assets of an estate including his

14  decisions regarding whether assets are worth liquidating and

15  whether litigation is worth pursuing.

16         The chapter trustee is not required to prosecute

17  every cause of action belonging to the bankruptcy estate.

18  Instead, the trustee is given a substantial degree of

19  discretion in deciding how best to administer the estate

20  committed to his care and his actions are measured by a

21  business judgment standard. So here, we respectfully submit

22  it's proper to acknowledge and accept the chapter trustee's

23  determinations in these cases.

24         Now, meanwhile, the law makes clear that a court's

25  authority over counsel, and that's whether it's statutory or

21

1   inherent, must be exercised in a manner that's consistent with
2   the applicable rules and boundaries and not in some unfettered
3   or time open-ended fashion.  A court's authority exists and
4   must be exercised within the correct time, context, and manner.

5           And the Fifth Circuit said that basically in the case
6   of In re Thalheim, 853 F.2d 383.  The court there held that a
7   court is not free to disregard statutes and rules merely by
8   invoking its inherent authority.  Similar case is U.S. v.
9   Sutton, 786 F.2d 1305, a case that -- the court there held that
10  Section 105 of the Code does not authorize bankruptcy courts to
11  create substantive rights that are otherwise unavailable under
12  applicable law and that Section 105 does not permit some kind
13  of roving commission to do equity.

14          And so what we think this means, Your Honor, is that
15  the notions of court authority over counsel that are relied
16  upon in inchoate fashion by the UST here simply cannot operate
17  in derogation to Section 350(a) and Rule 5009.  I think the
18  UST's responses implicitly recognized that because they offer
19  no answers to the precedential cases which establish that case
20  closure under Section 350(a) is to occur expeditiously and
21  ministerially when the conditions for closure exist.

22          The gist of the opposition from the UST relates to
23  her apparent personal misgivings of UpRight Law and its debtor
24  clients and the resulting argument, well, hey, look, they're
25  trying to obtain a result that will work in their favor and so,

1  please, court, don't listen to them.  Well, if those kinds of

2  sentiments were material, if personal motivations matter, well,

3  then we really have a mutual (indiscernible) because then the

4  movants could argue persuasively for case closure on the count

5  that, well, it appears the UST is targeting the movants -- I'm

6  not sure, personal animosity, perhaps -- in order to achieve a

7  result that she wants.

8      Again, none of that really matters under Section

9  350(a) or Rule 5009 and the case law.  This is not a situation

10  of discretion.  There's simply no precedent or other legal

11  support for the UST's contention that a bankruptcy court has

12  the discretion to determine that a case, which under the facts

13  and the law is fully administered, can be characterized or

14  really mischaracterized as not really fully administered and,

15  therefore, should not be closed, notwithstanding the command of

16  Section 350(a) because of the Court's inherent authority or

17  convenience or personal viewpoints or any other reason not

18  provided for in the statute.

19      So, in conclusion, Your Honor, based on our

20  undisputed facts and as a matter of law, the Court is

21  respectfully requested to and should expeditiously end this

22  Potter case and the other cases at bar, discharge the Chapter 7

23  Trustee, and close the case.  Thank you.

24      THE COURT:  Okay.  Any response, Mr. Skaggs?

25      MR. SKAGGS:  Yes, Your Honor.  I will take into

1  account the Court's initial statement that the Court had read

2  the briefs, and so I'll try to be brief on this particular

3  matter.

4        THE COURT:  I hope you address any point you feel you

5  need to.  You have all the time you want to.

6        MR. SKAGGS:  Thank you, Judge.  The first point I do

7  want to raise is the fact that the U.S. Trustee has filed an

8  adversary proceeding in this case, the Potter case.  It was

9  filed yesterday, admittedly, only yesterday but it is of

10  record.  It's a 26-page complaint that talks about the various

11  facts that we believe exist in that particular case, Judge.

12        Included in those facts are how this particular

13  debtor, Ms. Potter, did not get adequate legal representation

14  by Mr. Homa.  She retained UpRight Law after her mother was

15  served on the eve of Mother's Day in 2018.  She gets served

16  with -- her mother gets served with a complaint for her

17  daughter, Ms. Potter.  Within 42 minutes of that service on a

18  Saturday night, Ms. Potter contacts UpRight Law, decides to

19  file a Chapter 7 bankruptcy case after speaking with a UpRight

20  finance consultant who is not an attorney, and proceeds to pay

21  $50 towards attorney's fees that UpRight Law charges in this

22  case.  I think that amount is $16.75, an amount that --

23        THE COURT:  How did she pay that $50 so quickly?

24  What process; do you know?

25        MR SKAGGS:  She paid -- debit card, Your Honor.

1      THE COURT:  Debit card.

2      MR. SKAGGS:  UpRight Law's practice is to get a debit

3  card during that first phone call.  And that's what happened in

4  this case.  So she gets served with that paperwork.  She

5  retains UpRight Law before speaking with an attorney.  And

6  after she gets served, after she retains UpRight Law, she

7  proceeds to go to the first appearance in a state court case.

8  She actually goes to that first appearance in the state court

9  case, signs off on a judgment, and then enters into a payment

10  agreement whereby she makes payments, I believe, of $125 to

11  this creditor while she is supposed to be making payments to

12  UpRight Law.

13      During the time that she pays UpRight Law, she speaks

14  with Mr. Homa maybe one time, I believe, is what the facts will

15  show, and she's not getting proper legal advice.  Then, she

16  pays UpRight Law in full in December of 2018.  She doesn't

17  actually speak by telephone with Mr. Homa until sometime in

18  February of 2019, but yet the case is still not filed, Your

19  Honor, until June of 2019.

20      And during that time period, Your Honor, Ms. Potter

21  makes two requests, two requests to cancel her arrangement with

22  UpRight Law.  She paid them over $2,000 with the court filing

23  fee, this single mother who gets zero assistance from the

24  father of her child.  She's struggling to get -- to make ends

25  meet.  She's got $10,000 of unsecured debt, we cited, for

1  student loan debt.  And at that time, she gets a tax refund

2  back.  And so with the money that she got from her tax refund

3  and the money she paid to UpRight Law, she has over $10,000 of

4  cash available to her.

5          And at the same time that she already paid in full

6  the fees to UpRight Law and then paid on that judgment that she

7  shouldn't have paid on, she is receiving offers from these

8  credit card companies, these debt collectors, to make

9  settlements of 40 cents on the dollar.  So she gets out of that

10 $10,000 of debt for 4 grand and still has $6,000 available.

11 But she's not speaking with her attorney.  She's not meeting

12 with her attorney.

13         In fact, in this case, Your Honor, the first time --

14 in the Potter case, the first time Ms. Potter actually laid

15 eyes on her attorney was at the meeting of creditors just

16 beforehand.  Just before the meeting of creditors is the first

17 time Ms. Potter's ever met with Mr. Homa.  And she's asked

18 during her examination about the fees paid.  She is shocked to

19 know that Mr. Homa's fees in this other case in the Southern

20 District of Illinois was less than $600.

21         So those are the facts that are spelled out in the

22 adversary complaint that we filed yesterday in the Potter case.

23 Mr. Armgardt makes the argument for the suggestion that there's

24 personal motivations by the U.S. Trustee targeting the movants,

25 targeting UpRight Law and the debtors.  That couldn't be more

26

1  farther from the truth.  If Mr. Armgardt, Mr. Buch, Mr. Homa,
2  Mr. -- or anyone at UpRight Law has information concerning
3  other cases where other firms are engaging in the same activity
4  that we believe UpRight Law is engaging in, by all means,
5  please let us know who they are.  The U.S. Trustee would take
6  action and review those matters, as well.
7          The Court is very much aware of the fact that the
8  Court on its own has called other attorneys not associated with
9  UpRight Law before to explain fees and its performance in a
10 particular case.  U.S. Trustee has brought actions against
11 numerous attorneys.  Mr. Buch, we brought actions against.
12 He's explained the situation in the various cases that are now
13 associated with UpRight Law.  Marcus Herbert, another
14 practitioner in the Southern District of Illinois, he can
15 testify that we have brought actions against him.  There are
16 other -- numerous other attorneys where the U.S. Trustee has
17 taken action and other cases in which the U.S. -- or in which
18 the Court itself has taken action to examine the fees and the
19 services that are provided by these -- by a debtor's attorneys.
20         I think the biggest thing that UpRight's complaining
21 about is they don't believe the Court has the authority to
22 review these and that the Court does not have the authority to
23 order or allow 2004 examinations.  I mean the case law is very
24 clear.  The statute is very clear.  Section 329 allows review
25 of fees.  We have the 526, 527, 528 provisions that allow for

the review of the conduct of debtors' attorneys in cases.
Those are recently added in the 2005 amendment of BAPS CPA.
You have Bankruptcy Rule 2017 that couldn't be more explicit
that says parties in interest, including the court on its own
can ask for review of attorney's fees.

In this case and all the other pending cases, the
Court asked for a review of the attorney's fee based upon
information contained in the petition filed with the Court.
That is absolutely within the Court's ability to do so.  The
U.S. Trustee has filed motions for the Rule 2004 examination.
For some reason, UpRight believes that it's not a proper
mechanism.  That is an absolute misstatement of what 2004
allows.

The Court has been very consistent in granting these
motions.  There's good caused as spelled out in the Court's
orders granting these motions.  We're attempting to get these
examinations conducted.  Let's talk a little bit about what
UpRight says, oh, they're not delaying things.

Your Honor, these matters are being delayed because,
one, they object and, two, we asked for the documentation,
they're not providing the documentation.  The first case we
took, the examinations in the Curry case, we have 3,000 pages
of documents.  Now we're getting 150, 300 documents.  Well, I
know they're not providing all of the documents that were
allowed in the motions for 2004 examinations.  Now that's not

1  before the Court yet, but it's going to be because UpRight

2  continues to restrict what they provide to us.

3       The other course of conduct that we're seeing from

4  UpRight with these orders for Rule 2004 examinations -- is that

5  they will redact entire pages.  They'll redact entire

6  questionnaire that Mr. Buch puts forth in his -- what he uses

7  to ask questions to complete the bankruptcy petition and

8  schedule.  That is all discoverable under U.S. v. White.

9  There's no dispute about that.

10       What does Mr. Armgardt do?  He redacts all those

11  pages, I had to review them, then I had to e-mail him and then

12  eventually he gets around to actually providing the unredacted

13  version.  I'm seeing redactions of things that are not

14  considered PII, so for Mr. Armgardt to say that they're

15  providing all this documentation is simply a misstatement of

16  what he himself is actually doing.

17       Mr. Lavery didn't engage in this conduct.  It's Mr.

18  Armgardt who's engaged in this particular conduct.  So, excuse

19  me, it's not an accurate statement for Mr. Armgardt to say that

20  they are providing all the documentation.  They simply aren't.

21  They're not providing any of the training materials that have

22  been requested.  That information is requested, and it's just

23  simply not provided.  So there are issues with their

24  cooperation, and he says there are not.

25       None of the cases -- Your Honor, none of the cases

1  that are cited by UpRight Law in its motion or in its reply in

2  further of support of its motion are on point.  They don't say

3  that a case requires the closure of a case.  The Court

4  initiated these actions.  The Court could be setting these for

5  hearings every 30 days.  Are they saying -- or whatever time

6  period it wants.  Is UpRight Law really arguing that, well,

7  because there's no formal objection to the no-asset report

8  being filed that the Court can't then conduct its own inquiry?

9  That doesn't make sense.  That's not what the provision 350(a)

10  and Bankruptcy Rule 5009 provide.  Those rules only provide for

11  presumption.  The Court can look at its docket and see that

12  these issues are still pending before the Court and could still

13  consider that information and keep these cases open.

14          Mr. Armgardt simply misstates what the law is, and

15  it's offensive.  He says that Kind Heart prevents any of this

16  stuff.  They're still arguing about Kind Heart preventing

17  review of its fees.  That simply can't be farther from the

18  truth.

19          As I mentioned, this review does not violate UpRight

20  Law's right to equal protection.  Marcus Herbert, J.D. Graham,

21  Mike Benson, Brad Olsen, others have all been subject to review

22  of their attorney's fee -- their attorney's fee in actions in

23  their cases.  And so it's not simply a target of UpRight Law.

24  Again, that's just simply inaccurate.

25          The other provision that or other argument that

30

1   UpRight makes is -- I had a chuckle -- that is the U.S.

2   Trustee's Handbook provision saying that because the U.S.

3   Trustee wants the first line Chapter 7 case Trustee to review

4   attorney's fees and action that because they haven't done --

5   they haven't referred these cases -- they're making that

6   assumption -- they haven't referred these cases to us, that

7   that's a statement that the fees are fine and that we, U.S.

8   Trustee, cannot then take any action on it.  That's just simply

9   not the case.

10          The U.S. Trustee's Chapter 7 Trustee Handbook cannot

11   in any way overrule the provisions of Section 329 or Bankruptcy

12   Rule 2017.  We often, as the Court is aware, often ask our

13   Chapter 7 Trustees to report issues to us that they see, issues

14   of bad faith under 707(b), issues of denial of the discharge

15   under Section 727, and the other issues relating to the

16   attorney/client relationship.  Just because they don't or may

17   not send us the referral, Your Honor, does not mean the U.S.

18   Trustee can't take action on her own or that the Court in the

19   section under attorney's fee review under Bankruptcy Rule 2017.

20   The Court still has the ability to review fees.

21          Are they saying is -- up UpRight Law really saying

22   that because the case trustee doesn't bring it to the Court's

23   attention that the Court then can't on its own bring the issue

24   up?  That's just simply not the case, and to suggest otherwise

25   as they've done really is disingenuous at best.  I'd ask --

1  based upon the pleadings, I'd ask that the motion to close this

2  case and all the other pending cases -- certainly, the Potter

3  case -- be denied, especially given -- in light of the fact

4  that we have filed an adversary proceeding in this particular

5  case.

6      THE COURT:  Okay.  Are you concluded, Mr. Skaggs?

7      MR. SKAGGS:  Yes, Your Honor.

8      THE COURT:  Okay.  Well, right now we are on the

9  Potter case.  I'm calling these cases one by one today.  So

10  I've heard arguments of counsel and -- of both counsel, and I

11  note in the Potter case the facts that the Trustee has alleged

12  in his complaint that he's filed.  I also note from looking at

13  the file itself the length of time.  Initially, it was about

14  seven months for the debtor to get the payments made to the

15  attorney and then after the payments were made, the debtor

16  waited another six months until December -- until June 18th,

17  2019 to -- for her case to be filed.

18      And as her statement of financial affairs, the SOFA,

19  I'll refer to it that way throughout these hearings today,

20  showed that a lawsuit was filed against the debtor in 2018.

21  And based on what the Trustee has alleged and from the 2004

22  exams, it appears that debtor may have made some payments on a

23  lawsuit during the time when she was also seeking assistance

24  and help from the UpRight Law Firm.

25      I requested that this case be examined because of

1   these time frames and the amount of fees that were paid that

2   were significantly more than the attorney usually charges in

3   this case.  So based on my view of the facts and also now we

4   have a pending -- in this particular case, the Potter case, we

5   have a pending adversary complaint against debtor's counsel and

6   for reasons to be set forth in an opinion, I'm going to -- this

7   case will not be closed.  The Potter case will not be closed,

8   but we'll do a written opinion as to that.

9            Next case, please.

10          COURTROOM DEPUTY:  Docket Number 6, United States

11   Trustee versus Kristyn Curry and James Ford.

12          MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

13          MR. ARMGARDT:  Charles Armgardt for UpRight Law and

14   James Ford.

15          MR. FORD:  James Ford for Kristyn Curry.

16          THE COURT:  All right.  I heard a lengthy argument

17   from both counsel in the Potter case with regard to the legal

18   theories whether the case and the motion to close should be

19   granted or not.  Is there any additional argument to be made in

20   the Curry case?

21          MR. ARMGARDT:  Your Honor, I would just point out

22   that the petition was filed 700 days ago in the Curry case, 23

23   months ago.  The case became properly closeable 604 days ago,

24   approximately, some 20 months ago.  The time for the UST to

25   object to the Trustee's final report ended 639 days ago, some

1   21 months ago.  This case is very stale.  It should be closed

2   under Section 350(a).

3           The arguments regarding the Potter case regarding

4   production of documents and issues about that, well, none of

5   that's material to Section 350(a) and the fact is we are

6   producing extensive amounts of documents.  Mr. Skaggs

7   complained about not having training materials.  He has the

8   training materials from the other productions, so that's not an

9   issue.  And so I'm not aware of any adversary proceeding in

10  this case.  And even if there were, that would just be its own

11  separate proceeding.  That wouldn't be reason to not close this

12  case.

13          So we respectfully submit that it should be closed

14  for the -- including for the reasons that I described in the

15  prior discussion of the prior case, the Potter case.

16          THE COURT:  For the purposes of each of the cases as

17  we go forward, I will note for the record, the Court

18  acknowledges all of the arguments made in the Potter case as

19  applicable to the cases as we go forward.  Otherwise, we're

20  going to be here with an hour repeating the same thing on each

21  case.  Is that agreeable to both counsel?

22          MR. ARMGARDT:  Yes, Your Honor.  Thank you.

23          THE COURT:  Okay.

24          MR. SKAGGS:  Yes, Your Honor.  It's the U.S. Trustee.

25  Your Honor, if I can respond to or add to on the Curry case?

1        THE COURT:  Okay.

2        MR. SKAGGS:  And that is I will ask the Court to note

3   that in the Curry case, there is still pending the Rule 2004

4   exam request of the chief operating officer of UpRight Law.

5   That was argued back in July, and so we're waiting for that.

6   That's an issue -- awaiting for that decision.  That's an issue

7   that still is out there which would -- we argue or suggest

8   would also prevent the closure of this particular case.

9        The Curry case, again, is the original case that the

10  Court brought to everyone's attention because the fees charged

11  was $1,725, which is much greater than what Mr. Homa or what

12  Mr. Ford typically charges on his cases.  The length of time of

13  filing the bankruptcy case after it was paid in full was 83

14  days.  The length of time to the first payment of filing to the

15  filing of the case was 169 days.  It took 86 days to get the

16  payments in full, and so another almost three months after the

17  payment in full for Mr. Ford to file this bankruptcy case.

18       We're still looking at the case.  We want to take the

19  examination of the chief operating officer, and we think that's

20  important before we would take any action in that particular

21  case.

22       THE COURT:  Okay.  I want to note for the record the

23  Court takes any exception of the fact that there's any

24  allegation that the Court has let these cases languish.

25  Throughout these cases, particularly in the Curry case, we had

1  the initial hearing in October of 2018.  That's when the case
2  was filed, I believe.  And then we had a hearing regarding fees
3  and fee disclosure.  That was in November of 2018.  And then in
4  April of 2018, there's a motion for examination fees.  Of
5  course, there's an objection filed to that 2004 exam, and then
6  we have a hearing on 2004 exam at which point I believe I
7  granted the motion for 2004 exam.  It was allowed.

8       And then later we had another motion filed to take
9  the 2004 exam of the CLO.  Well, then there's an objection to
10  that, and so that delays things.  Meanwhile, in one of the
11  other case, we had a motion to withdraw the reference going up
12  to the district court, which delayed things.  And not that you
13  don't have a right to file them.  I'm not saying you don't have
14  a right to file these thing, but they take time.  And while the
15  motion to withdraw the reference went up to the district court
16  and a hearing was held up there and ultimately the district
17  court ruled against that, that took time.

18       And then we had a series of motions for 2004 exams in
19  these various cases that took place just about the time the
20  Court was shut down for the COVID issues, and we had those on
21  the phone.  And we have been getting those opinions out, orders
22  out as fast as we can because there's a lot of cases here.  So
23  when we have to write a several-page order on each case, it
24  takes a long time.  But we are doing it as quickly as we can,
25  and I think in each of those cases, we got the orders out

1   probably within 90 days, and we had a lot of cases to go
2   through.

3           So I take any exception if there's an accusation here
4   that the Court has let these things languish, but we certainly
5   haven't.  We try to set them timely within the time objections
6   are filed or various motions are filed.

7           So in the Curry case, which is one of these cases
8   that was the first one to come to the Court's attention, came
9   to the Court's attention because Mr. Ford normally charges
10  about $830.  In this case, suddenly he's filing a case under a
11  different name, UpRight Law, and his fee jumps to $1,725.
12  There is -- there are time gaps that Mr. Skaggs referenced
13  between the time over which it took to pay the fee in the first
14  case and once the fee's paid in full, there's another time gap
15  of over three months almost before the case gets filed.

16          We had a prior hearing on this case where the UST
17  reported that they conducted a 2004 exam of Kristyn Curry and
18  James Ford, but neither knew the basis of why $1,725 was filed.
19  Mr. Ford himself stated he didn't know, and he was at that
20  hearing and didn't respond when Mr. Skaggs made that statement
21  otherwise.  On April 30th of 2019, the UST filed a motion for
22  2004 exam of Richard Angler (phonetic).  He was the staff
23  person who apparently set the fee for UpRight Law.  He's the
24  first person Ms. Curry talked to.

25          UpRight Law filed an objection to that 2004 exam, but

1  the motion was granted after a hearing was held on May 15th of

2  2019, and the UST issued a subpoena.   UpRight Law then filed

3  an objection with the Northern District of Illinois seeking a

4  protective order as to that.  Once again,  this takes time.

5  Courts do their job.  We rule on these things, but it takes

6  time.  You have to give notice.  You have to set hearings.

7         The Court transferred the objection back to this

8  court.  The 2004 exam of Mr. Angler was ultimately conducted

9  after that big time gap of it being requested.  It was finally

10  -- it took until December of 2019 for that to be taken in

11  Chicago.  So I don't think anything's languishing here in the

12  Court.  A status hearing on the disclosure of compensation of

13  attorneys and accounting fees was continued generally

14  throughout this case while the UST attempted to obtain

15  information through these 2004 exams.  And then, finally, I

16  don't think the 2004 exam has been taken yet of Mr. McClellan

17  (phonetic) because a request was made on June 20th.  Because

18  Mr. Angler was unable to provide the information, the UST

19  requested a 2004 exam of the COO.  And objections were filed to

20  that by UpRight Law, and the matter was heard on July 8th of

21  this year.  I was taking that matter under advisement, and I'll

22  get an order on that one out right away.  I think that is set

23  to get issued.

24         But, once again, we have a case that came to the

25  Court's attention because of a significant unusual charging of

1  fees, much higher than usual, and lots of gaps and periods of

2  time when the debtor seemed to languish without a lot of legal

3  assistance other than maybe an intake person at UpRight.

4  That's why the Court wanted an examination here, and that's why

5  the Court wanted the U.S. Trustee to look at these fees.

6          So with regard to the motion to close the case in the

7  Curry case, that motion will -- the motion, both of those

8  motions will be denied and we will have a written opinion to

9  follow.

10          Next case, please.

11          COURTROOM DEPUTY:  Docket Number 7, the United States

12  Trustee versus Sandra Dennis and James Ford.

13          MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

14          MR. ARMGARDT:  Charles Armgardt for UpRight Law and

15  James Ford.

16          MR. FORD:  James Ford for the debtors -- for the

17  debtor.

18          THE COURT:  Okay.  Does either counsel have any

19  additional legal argument to make with regard to the motions to

20  close?

21          MR. ARMGARDT:  Your Honor, if I may, just real

22  quickly.  My comments were not intended to be anything offense

23  of the Court.  I was just pointing out that, yes, all of this

24  is very time-consuming and burdensome and, as a result, we

25  respectfully submit harmful and prejudicial.

1   I also wanted to address real quickly this is having

2   to do with the Curry case where Your Honor indicated that Mr.

3   Angler set the fee.  We actually discussed that in a hearing in

4   the Curry case, and I had outlined for the Court the testimony

5   on that point, which I'd like to incorporate here, the

6   testimony indicating that Mr. Angler in fact did not set the

7   fee.  And there was -- the testimony of Mr. Angler and Ms.

8   Curry and Mr. Ford on that point was all outlined page and

9   line.  And so I would respectfully suggest that those facts be

10  brought to the Court's attention.

11  As for the legal argument, I appreciated and thank

12  the Court for acknowledging that my legal arguments in the

13  context of the Potter case will apply here in the Dennis case.

14  THE COURT:  Okay.  Mr. Skaggs, any response?

15  MR. SKAGGS:  Yes, Your Honor.  The Dennis case, it

16  took Ms. Dennis 703 days to get her fees paid.  Then after her

17  fees were paid in full, it took 281 days to get the case filed.

18  And the fees, again, charged by Mr. Ford are much higher than

19  what he usually charges.  His fee in this case was $1,425.

20  Additional in this case, Judge, is we attempted to

21  conduct a 2004 examination of Ms. Dennis.  In fact, myself, my

22  co-counsel, Mr. Ford, and Mr. Armgardt were all present in the

23  341 meeting room in Denton, Illinois, attempting to take Ms.

24  Dennis' examination, but she did not show up.  We understood

25  that she would show up, but that's why we appeared.  But she

40

1  did not show up.  We still have not received any additional

2  dates about when Ms. Dennis was available for examination.

3        One thing that we noticed through review of the

4  documents is that Ms. Dennis was actually canceled by UpRight

5  Law as a client.  In order to get her case reinstated, Ms.

6  Dennis whose income is limited Social Security income which is

7  apparent on Schedule I and on the statement of financial

8  affairs so she lives in very limited income, she was charged an

9  additional $25 to reopen the case.  So I think there is

10  sufficient grounds to keep this case open, the Sandra Dennis

11  case open.  We've attempted to do the examination.  We were not

12  successful.  We're still wanting to take the deposition or

13  examination of Ms. Dennis, and we still intend to do so.

14        So I think there's sufficient grounds to deny the

15  movant's motion to close this particular case.

16        THE COURT:  Okay.  The Court's reviewed the facts in

17  this case, and the debtor paid $1,750 to UpRight over the

18  course of two years from July 2nd, 2016 to June 5th, 2018.  The

19  case then languished at the law firm for nine months until

20  March 13th, 2019 when the case was finally filed.  This was

21  after payment had been made in full, nine months after payment

22  had been paid in full, a fee that was much higher than Mr. Ford

23  usually charges.

24        The debtor's only source of income was Social

25  Security and some SNAP benefits totaling $1,329.  She was

1  clearly eligible for a waiver of the filing fee but paid the

2  filing fee to the Court and no request was made for a waiver.

3  The debtor's assets totaled $2,435, which included a cemetery

4  plot valued at $1,000, some nominal amount of furniture, and

5  the Precious Moments collection.  There were no secured

6  creditor in this case, and about $7,957 in non-priority

7  unsecured claims.

8         The debtor was pretty much judgment-proof, but

9  despite that paid for over two years and significantly more

10  than she could have retained Mr. Ford for had she just walked

11  into his office.  But because he was now an UpRight attorney,

12  the fee was substantially more.  And the fact that she was

13  eligible for a fee waiver and that wasn't either brought to her

14  attention or it wasn't filed for some reason is another

15  question the Court has.

16         In a hearing we had a couple of weeks ago, Mr. Buch

17  said, well, he was never aware of a case where the court had

18  granted a fee waiver when the attorneys had been paid.  And I

19  will give Mr. Buch this.  Never in a case like this or in these

20  type of UpRight cases where the attorneys are paid in some

21  instances almost twice as much as they normally have been paid

22  has a request ever been made, so I haven't had the opportunity

23  to grant it or not.

24         And it kind of begs the question Mr. Buch sort of

25  insinuated that the Court wouldn't grant it because the

42

attorney's fees were paid and maybe UpRight didn't want to
bring to the attention the amount of the fees that are being
paid to the Court so they didn't file these requests for fee
waivers.  I don't know.  But these are the reasons why I have
requested that the fees be examined in these cases, and I said
quite often, I'm trying to understand what's going on, what the
length of time when the payments are made, what value is being
added here by the UpRight banner being added to the local
attorney's name that causes the fees to be so much more and in
some cases for the debtors to be so underrepresented not to
even have the contact of an attorney but some staff person.

   So based on the facts that I've set forth today and
the fact that the attorneys have also stated on the record for
Sandra -- the motion to close in the Sandra Dennis case, will
be denied and a written order we'll issue further setting forth
the Court's reasoning.

   Next case, please.

   COURTROOM DEPUTY:  Docket Number 8, United States
Trustee versus Thomas and Christy Schnack and James Ford.

   MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

   MR. ARMGARDT:  Charles Armgardt for UpRight Law and
James Ford.

   MR. FORD:  James Ford for the debtors.

   THE COURT:  Okay.  We have two motions to close here.
Either counsel have any additional legal argument to make that

1 hasn't been made in the briefs or otherwise made in the cases

2 we've had so far today?

3        MR. ARMGARDT:  No, Your Honor.

4        THE COURT:  Mr. Skaggs?

5        MR. SKAGGS:  Your Honor, the U.S. Trustee -- yes, the

6 U.S. Trustee would simply point out again the timing of 872

7 days to get the fees paid, an additional 29 days to get the

8 case on file.  The Court -- the U.S. Trustee will advise the

9 Court that these particular debtors originally were located in

10 Texas, I believe in the Houston area.  And they did suffer the

11 loss of the Hurricane Harvey back in September of 2017, so that

12 was one issue that may have contributed to the delay of the

13 case.

14        But the other issues in this particular case, as

15 shown by the itemized fee statement, is that these debtors as

16 is true in virtually all, if not all, of Mr. Ford's cases,

17 don't actually meet with him in person until they are there to

18 review and sign the final draft of the bankruptcy petition

19 schedules.  And then on that very day in most, if not all the

20 case involving Mr. Ford, the case gets filed that day.  Now

21 that's clearly contrary to this Court's ruling in In re Harps

22 (phonetic) case, which required at least a meeting at the

23 beginning when these people consider filing bankruptcy.  And,

24 you know, it might have been difficult in this case for Mr.

25 Ford to do that given that they were originally located in

44

1    Texas, but when he was assigned the case consistent with the
2    Harps case, he should have brought these people in and
3    discussed their situation and whether they actually needed to
4    file bankruptcy.

5           The fees were higher in the Schnack case compared to
6    what Mr. Ford typically charges.  They were $1,150.  I think
7    Mr. Ford's fee is at the time was a regular amount of $847.  So
8    there is a difference, and it doesn't appear based upon the
9    itemized fee statement that UpRight Law provides any
10   substantive legal services to the debtor.  It simply collects
11   money.  That's what the service is that UpRight Law in Chicago
12   appears to be providing.

13          So we'd ask that the Court deny the motions to close
14   the case.

15          MR. ARMGARDT:  Your Honor, may I real quickly?

16          THE COURT:  Sure.

17          MR. ARMGARDT:  Thank you.  Well, in this case, the
18   debtors talked with a partner attorney in Texas just two days
19   after they contacted UpRight Law, and that conversation was for
20   more than half an hour.  And then they did relocate to Southern
21   Illinois.  And Mr. Ford talked with them for approximately a
22   half an hour just two days after the case was reassigned to
23   him.  So there has -- the facts show that there was personal
24   attention there by Mr. Ford.

25          I'm not sure that this idea of meeting in person is a

1  requirement, particularly during pandemic days.  And so -- and

2  the fee here is in line with the fees charged by other lawyers

3  in other cases.  Any fee refund would be exempt anyway.  And so

4  there really isn't grounds to keep this case open, Your Honor,

5  and we would ask that it be closed.

6          THE COURT:  Okay.

7          MR. SKAGGS:  Your Honor, briefly.

8          THE COURT:  Yeah, please.

9          MR. SKAGGS:  Briefly.  I mean this case occurred --

10  the case was filed in September of 2019.  That's before the

11  COVID pandemic occurred.  Now I understand the issue with the

12  pandemic.  I'm working from home today and will be for some

13  time in the foreseeable future.  This case was not affected by

14  it.  That -- the pandemic did not prevent Mr. Ford from meeting

15  with these clients.  I mean that argument should just be denied

16  summarily.

17          THE COURT:  Okay.  The Court notes that the debtors'

18  made installment payments to UpRight Law for attorney's fees

19  from April 3rd 2017 through August 23rd, 2019, a period of more

20  than two years, during which time a lawsuit was filed against

21  Mr. Schnack, the debtor, by Second Round Sub, LLC.  And we

22  don't know what happened with that case during the course of

23  being represented by UpRight.

24          The debtors also listed on their schedules a $525

25  refund that was due from UpRight Law.  The Court doesn't know

1  whether, you know, there was some kind of automatic withdrawal

2  from their account that just kept coming and coming and no one

3  realized that they had paid in full. The Court doesn't know

4  why there's this refund due from UpRight, but apparently

5  there's a refund due from UpRight. And then it's just baffling

6  to me that we have certain cases where there's a refund due

7  from UpRight. But, nonetheless, the case was ultimately filed

8  September of 2019, so this is well over two years of making

9  payments and the case finally gets filed.

10        In this case, I'm going to deny the motion to close

11  the case, both motions. I want to find out why is it that

12  these refunds were due before filing and were they paid back.

13  These are things the Court doesn't know. And what happened

14  with these lawsuits that were pending? Were the debtors left

15  to defend those on themselves -- by themselves? Were they

16  given any advice by UpRight while being represented by them

17  during this two-year period? These are reasons the Court wants

18  to keep the case open to examine these fees to see if they're

19  reasonable in light of the services rendered. So this case

20  will not be closed, and a written order we'll enter to support

21  the denial of the motion to close.

22        Next case, please.

23        COURTROOM DEPUTY: Docket Number 9 United States

24  Trustee versus Wendall Haws and James Ford.

25        MR. SKAGGS: Mark Skaggs for the U.S. Trustee.

47

1          MR. ARMGARDT:  Charles Armgardt for UpRight Law and
2    James Ford.

3          MR. FORD:  James Ford for the debtors.

4          THE COURT:  All right.  Any additional legal argument
5    on the Haws case?

6          MR. ARMGARDT:  Not so much legal argument, Your
7    Honor.  I would point out that there were meetings among the
8    partner attorneys and the debtor at the outset.  The case was
9    originally assigned to an attorney by the name of Joe Pioletti
10   and he talked with Mr. Haws on that first call to UpRight for
11   half an hour, and then Mr. Ford talked with Mr. Haws for a half
12   an hour just three days after the case was reassigned to him.
13   And then the case was handled expeditiously.

14          It did take two months approximately, but between the
15   time the case -- the fees were paid in full and when the case
16   was filed, but that's not an atypical period.  And, typically,
17   our issues with respect to compiling all the information needed
18   in order to file the petition, that certainly was the case in
19   the Schnack case.  I meant to bring to the Court's attention
20   there that Mr. Ford filed the case just one month after all the
21   fees were paid.  So, certainly, the evidence indicates he acts
22   expeditiously when he has the information and the documents
23   compiled that are necessary to file.

24          THE COURT:  Okay.  We are on the Haws case.  Any
25   additional statements you'd like to make, Mr. Skaggs?

48

1          MR. SKAGGS:  Yes, on the Haws case, Judge, we have

2   taken examinations of Mr. Ford and Mr. Haws.  The retainer

3   agreement that was entered into, signed between the parties,

4   between UpRight Law, Mr. Ford, and Mr. Haws, provides in the

5   second bullet point, it'll say -- it states the following: "We

6   start work immediately.  We will start by immediately taking

7   your creditor calls and preparing your case."  And here's the

8   really important part, Your Honor.  It says: "As soon as your

9   payment plan is completed, we will get your filed for

10   bankruptcy."  So that's the representation that UpRight makes

11   to the debtor.

12          In this particular case, Mr. Haws paid over 283 days

13   -- it took him 283 days to pay.  And then the case was not

14   filed on day 283 or day 284.  In fact, it wasn't filed until

15   day 348, almost a year later.  So 65 days after the case --

16   after Mr. Haws has paid his fees in full, the case gets filed.

17   That is not the same as saying as soon as your payment plan is

18   completed, we will get you filed for bankruptcy.  That's a

19   pattern or a practice that we're seeing with UpRight Law that

20   is a misrepresentation of what they're going to do.

21          So there's sufficient grounds in this case, Judge, to

22   deny the motion to close the case.  The information that we

23   believe the chief operating officer will hopefully provide if

24   we're allowed to take his examination would also be relevant to

25   this particular case before an action would be filed.  So we'd

49

1  ask the Court to deny the motion to close the case.

2      THE COURT:  Okay.  The Court notes in addition to the

3  facts that have been set forth on the record by the parties

4  that during the course of the payments being made by the debtor

5  to UpRight, the statement of financial affairs indicates that a

6  foreclosure was filed in 2018.  Similarly, along the way, it

7  may have been dismissed in 2019.  The Court doesn't know why or

8  what happened there, but it's concerning that a foreclosure of

9  a home would take place while a representation's being made

10 that there wasn't a Chapter 13 filed if necessary.  The Court

11 doesn't know or maybe that's wasn't what the debtors wanted,

12 but these are questions that arise.

13     MR. FORD:  Your Honor?

14     THE COURT:  And --

15     MR. FORD:  Your Honor, this is James Ford.

16     THE COURT:  Yes?

17     MR. FORD:  The foreclosure case that was filed in

18 that case was filed against both Mr. Haws and his ex-wife who

19 was awarded the property in his divorce.  And she was

20 responsible to make the payments on that residence under the

21 divorce decree.  And the lender filed the foreclosure because

22 the wife had not carried through with her obligation.

23     And Mr. Haws and I had extensive discussions about

24 that, which were brought out in the 2004 exam.  And he decided

25 that he wanted to continue to file bankruptcy anyway even

1 though she apparently had remediated that -- you know, remedied

2 that situation and the lender dismissed the foreclosure at that

3 point.  So -- and that was also brought out in the 2004 exam.

4 Thank you.

5           THE COURT:  Okay.  Thank you for that additional --

6           MR. SKAGGS:  Your Honor?

7           THE COURT:  -- information.

8           MR. FORD:  You're welcome.

9           THE COURT:  Yes.

10           MR. SKAGGS:  I'm sorry, Your Honor.  This is Mark

11 Skaggs.  Now that Mr. Ford brought that up, I will add that Mr.

12 Haws is not aware of his option or the legal relief of filing a

13 motion in the divorce case to compel his ex-wife to hold him

14 harmless pursuant to a divorce decree.  He wasn't aware that

15 was an option that was available to him, and that was primarily

16 the reason why Mr. Haws filed bankruptcy.  So I mean all that

17 stuff can be spelled out, but we just need some additional

18 information in order to get that done.  So -- thank you.

19           THE COURT:  Okay.  Based on the facts set forth, it

20 appears there are still unanswered questions in this case.

21 They may have valid answers, but at this point, I'm going to

22 deny the motion to close in this case.  And a written order

23 we'll issue.

24           Next case.

25           COURTROOM DEPUTY:  Docket Number 10, United States

1  Trustee versus Boyce and Amanda Burns and James Ford.

2          THE COURT:  Okay.  We have a motion --

3          MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

4          MR. ARMGARDT:  Sorry, Your Honor.  Charles Armgardt

5  for UpRight Law and James Ford.

6          MR. FORD:  James Ford for the debtors.

7          THE COURT:  Okay.  We have, once again, motions to

8  close filed with objections filed by the Trustee.  Any

9  additional legal argument or other statements with regard to

10 the Burns case?

11         MR. ARMGARDT:  No, Your Honor.

12         THE COURT:  Okay.  All right.  The Court will note

13 that this case was filed on October 4th, 2019.  The debtors

14 made installment payments for about five months from June 29th

15 of 2018 to November 29th of 2018 but yet it took almost a year

16 after the payments were made for the case to be filed.

17         The statement of financial affairs show that during

18 2018, First Financial Bank filed a civil suit against the

19 debtors.  A judgment was entered in favor of First Financial

20 Bank in the amount of $10,548 on February 13th, 2019., months

21 after the debtors had already paid UpRight in full and the case

22 had lingered at UpRight.

23         Counsel for the United States Trustee represented to

24 the Court that after the state court judgment was entered, the

25 state court issued a memorandum of judgment and First Financial

52

1 Bank served a citation to discovered assets on the debtors
2 resulting in a lien on all of the debtors' property.  Further,
3 the hearing on the citation to discovery assets resulted in the
4 debtors making a payment agreement with the judgment creditor
5 pursuant to which the debtors paid $700 before their bankruptcy
6 was ultimately filed, $700 to the creditor.

7           These debtors also listed a $425 refund on their
8 schedules that was owed to them by UpRight, and it was -- it's
9 unclear at this point if that was ever repaid to the debtors.
10 What was really amazing to the Court is that for some reason
11 the debtors got overcharged maybe in the course of making their
12 payments to UpRight, I don't know, $425 while at the same time
13 they were left with an unfiled bankruptcy that cost them $700
14 in payments that they had to make to another creditor.

15           For these reasons and the Court is going to deny the
16 motion to close in both cases and ask the Trustee to make
17 further examination in this case as to what is going on here.
18 The Court notes that a motion 2004 exam was requested as to
19 attorney at both the debtor and Attorney Ford and that was
20 granted in April of this year, and an order was entered in June
21 of this year setting forth the granting of the 2004 exam.  And
22 for these reasons, both motions to close will be denied in this
23 case.  A written order will follow.

24           Next case, please.

25           COURTROOM DEPUTY:  Docket Number 11, United States

1 Trustee versus Betty Corey and James Ford.

2        MR. SKAGGS:  Mark Skaggs for the United States

3 Trustee.

4        MR. ARMGARDT:  Charles Armgardt for UpRight Law and

5 James Ford.

6        MR. FORD:  James Ford for the debtor.

7        THE COURT:  Any additional legal argument or

8 additional facts that the parties would like to set forth with

9 regard to the Corey case?

10        MR. ARMGARDT:  No, Your Honor.  Just wanted to for

11 the record remind that the Court has agreed that my arguments

12 made in the Potter case will apply to this case and the

13 additional cases on the schedule for today.

14        THE COURT:  Okay.  Once again, the Court will note

15 for judicial economy on each of the cases that are being called

16 today, the legal arguments that were originally made in the

17 Potter case are applicable to each of the case as we go

18 forward.  So the parties understand that okay?

19        MR. ARMGARDT:  Thank you, Your Honor.

20        THE COURT:  All right.

21        MR. ARMGARDT:  I apologize for --

22

23        THE COURT:  No, no.  I don't -- feel fee to ask, but

24 make it clear that I don't want the parties to have to restate

25 the same argument again and again.  It might take a couple of

54

1 days if we did that. The first argument took about an hour, so
2 here we are in the Corey case. And I was just going to say --
3 ask for the record again, does either party have anything else
4 to add or say with regard to the facts or the law that hasn't
5 already been stated with regard to the Corey case?

6          MR. SKAGGS: Your Honor, the UST does not have
7 anything addition to add other than what's been stated in prior
8 hearings which the Court is certainly aware of.

9          MR. ARMGARDT: And, Your Honor, I just wanted to say
10 for the record that our argument for the motions to close is,
11 one, the nature of the legal argument and I'm not here to argue
12 the facts. And so I would respectfully request that the Court
13 not take what might, you know, not saying something about a
14 particular nugget of fact in a particular case as some sort of
15 acknowledgment that what Mr. Skaggs or Your Honor might say
16 about the facts is the whole picture or accurate.

17          I just -- I don't have like an encyclopedic listing
18 of facts and didn't have prepared for today that kind of
19 specificity with respect to the facts. I have some statistical
20 information about each case, for example, how long it was
21 between the time that the case was -- that these were paid in
22 full and the case was filed, but I wasn't in a position to dig
23 deep to say, well, the reason for this period of time in that
24 case was X or Y. It was not really exactly germane to our
25 motions to close.

1      And so I would just ask the Court to acknowledge that

2 I'm not here to kind of argue like a summary judgment state of

3 facts with respect to each particular bankruptcy case.  That's

4 all I wanted to say, Your Honor.  Thank you.

5      THE COURT:  Any response, Mr. Skaggs?

6      MR. SKAGGS:  No, Your Honor.

7      THE COURT:  Okay.  All right.  Well, the Court will

8 note that counsel has -- Mr. Armgardt has selected the facts

9 that he chooses to set forth today and has stated that there

10 were other facts apparently he is not prepared to set forth

11 today.

12      The Court does note for the record on the Corey case

13 that the debtor made payments to UpRight for attorney's fees of

14 $1,150 and a filing fee of $335 from January 24th, 2019 through

15 October 17th, 2019, a period of almost ten months.  The

16 debtor's case was then filed on January 18th, several months or

17 so later.  The statement of financial affairs shows that in the

18 year prior to her filing when she was represented by UpRight,

19 the debtor had two lawsuits pending against her in Indiana.

20 The debtor paid an unsecured creditor, Americash Loans, a total

21 of $847.92 from October 30th, 2019 to January 8th, 2020.  So

22 this is after she's already paid in full her money to UpRight,

23 she's still paying an unsecured creditor waiting for her case

24 to get filed.

25      So these facts raise questions in the Court's mind as

1  to what was happening, how the debtor was being represented,

2  who was advising the debtor at UpRight during this period.  And

3  for those reasons, it's hard to determine whether the fee is

4  reasonable when the Court just doesn't know what was going on

5  here during the time frame.  So the motion to close case will

6  be denied.  A written order setting forth the Court's reasoning

7  and opinion will be forthcoming.

8          Next case.

9          COURTROOM DEPUTY:  Docket Number 12, the United

10  States Trustee versus Brandi Hill and James Ford.

11          MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

12          MR. ARMGARDT:  Charles Armgardt for UpRight Law and

13  James Ford.

14          MR. FORD:  James Ford for the debtor.

15          THE COURT:  Once again, the Court acknowledges the

16  legal arguments made in the Potter case and just request and

17  give either party an opportunity to state any additional legal

18  argument they'd like to make or factual you wanted to set forth

19  in the Hill case?

20          MR. ARMGARDT:  No, Your Honor.

21          THE COURT:  Okay.  All right.  The Court notes in the

22  Hill case that the United States Trustee requested a 2004 exam

23  that was granted in court.  After objections, it was granted in

24  court on April 29th, 2020.  A written order was entered by the

25  Court on August 10th of 2020.

1            The debtors paid UpRight $1,050 in attorney's fees

2    from March 18th, 2019 through October 11th, 2019.  The case was

3    then filed five months later. March 11th of 2020.  Debtor was a

4    single mother of two.  She could have qualified for a waiver of

5    the filing fee.  The schedule lists the debtor's monthly net

6    income of $2,108.17, which was well below the fee waiver cap of

7    $2,715.  The debtors had a nominal amount of assets, $3,541 in

8    assets, which included some household items, a 401k plan valued

9    at $1,255, and unpaid wages of $900.

10           Once again, the Court is left to wonder why it took

11   so long to file the case, why a fee waiver request wasn't

12   filed, why the fees were more -- although not a lot more than

13   Mr. Ford charges but why they were more and what great value

14   was added here, and why was it even necessary for this mother

15   to file bankruptcy.  These are all questions the Court has.  So

16   the Court is going to deny the motions to close the case

17   because the determination of whether the fees are reasonable

18   depends upon the answers to those questions.  And so the

19   motions -- both motions to close will be denied.  A written

20   order we'll enter setting forth the Court's reasoning.

21           Next case, please.

22           COURTROOM DEPUTY:  Docket Number 13, the United

23   States Trustee versus Andrea and Jason Lindsey and James Ford.

24           MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

25           MR. ARMGARDT:  Charles Armgardt for UpRight Law and

58

1  James Ford.

2          MR. FORD:  James Ford for the debtors.

3          THE COURT:  Any additional legal argument on the
4  Lindsey case?

5          MR. ARMGARDT:  No, Your Honor.

6          THE COURT:  Are there any other statements the
7  parties would like to make on the Lindsey case?

8          MR. SKAGGS:  No, Your Honor.

9          THE COURT:  All right.  The Court notes that the
10  debtor paid in the Lindsey case $1,150 in attorney's fees to
11  UpRight, which is slightly more than Mr. Ford usually charges
12  and that debtor paid relatively quickly.  From September
13  through October of 2019, the fees were paid.  But then once
14  again there was this delay of over five months to get the case
15  filed in March 14th of 2020.

16          The debtor qualified for a waiver fee application.
17  The debtor's income was $892.50 a month for a family of four.
18  Nevertheless, no application to waive the filing fee was paid.
19  And it poses the questions in the Court's mind as to whether
20  this was a reasonable fee or not and what was the nature of
21  this representation during this period.  Did the debtor to talk
22  to an attorney?  Did the debtor not talk to an attorney?

23          So for those reasons, I think it's too early to close
24  the case.  And a motion to close the case will be denied in the
25  Lindsey case.

59

1          Next case, please.

2          COURTROOM DEPUTY:  Docket Number 14, United States

3    Trustee versus Cullen Bond and James Ford.

4          MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

5          MR. ARMGARDT:  Charles Armgardt for UpRight Law and

6    James Ford.

7          MR. FORD:  James Ford for the debtor.

8          THE COURT:  All right.  Any additional legal argument

9    on the Bond case or additional facts that need to be brought to

10   the Court's attention?

11         MR. ARMGARDT:  No, Your Honor.

12         MR. SKAGGS:  No, Your Honor, for the U.S. Trustee.

13         THE COURT:  Okay.  The Court notes for the record

14   that in this case, UpRight was paid a fee amount of $1,250 in

15   attorney's fees for the period of -- relatively short period

16   from August 28th, 2019 to September 17th, 2019, and yet the

17   case wasn't filed until six months later in March 20th of 2020.

18   The statement of financial affairs shows that the debtor's 2016

19   BMW was repossessed on October 1st, 2019, which was after the

20   debtor had completed payment.

21         At the time of filing, the same creditor that

22   repossessed the vehicle had an action pending in Georgia.  The

23   debtor was unemployed and qualified for a fee waiver request as

24   I've indicated a zero income at the time of filing, but yet the

25   filing fee was paid.

1          Once again, these raise questions in the mind as to

2 whether the filing fee was -- or attorney's fees were

3 reasonable, who was providing legal services to the debtor that

4 allowed basically the attorneys to drop the ball here and not

5 get the case filed and perhaps there wouldn't be repossession

6 or maybe a good Chapter 13 should have been filed to keep the

7 vehicle. These are questions the Court has that seem awfully

8 odd under the circumstances and the fact no fee waiver was

9 requested -- filing fee waiver was requested.

10          So for those reasons, both motions to close will be

11 denied. A written order we'll issue setting forth the Court's

12 reasoning.

13          Next case.

14          COURTROOM DEPUTY: Docket Number 15, the United

15 States Trustee versus John Smiley and James Ford.

16          MR. SKAGGS: Mark Skaggs for the U.S. Trustee.

17          MR. ARMGARDT: Charles Armgardt for UpRight Law and

18 James Ford.

19          MR. FORD: James Ford for John Smiley.

20          THE COURT: Any additional legal argument to be made

21 on Smiley case or facts to be -- bring to the Court's

22 attention?

23

24          MR. ARMGARDT: No, Your Honor.

25          MR. SKAGGS: No, Your Honor, for the U.S. Trustee.

1        THE COURT:  The Court notes for the record that the

2 debtor paid UpRight $1,375 in attorney's fees from January 4th,

3 2018 through May 2nd, 2019, a period more than 15 months.  Then

4 it took yet another nine months for the case to be filed.  It

5 wasn't filed until February 8th, 2020.  The debtor's only

6 income was unemployment of $784 qualifying him for a fee waiver

7 but yet he paid the filing fee.

8        The fee statement reflects that the debtor only met

9 with an attorney in person once when he met with UpRight's

10 local attorney, Jim Ford, on February 8th, 2020, the date the

11 bankruptcy was filed.

12        The Court notes that it was quicker to get a motion

13 to close filed than it was to get the case filed, once it was

14 paid in full.  So, once again, the Court has several questions

15 regarding the delays in getting this case filed, the failure to

16 file a fee waiver request, and the justification for fees that

17 is significantly higher than Mr. Ford usually charges.

18        For those reasons, the motions to close case will be

19 denied.

20        Next case, please.

21        COURTROOM DEPUTY:  Docket Number 16, Jeffrey and

22 Julie Thulin and Ron Buch.

23        MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

24        MR. ARMGARDT:  Charles Armgardt for UpRight Law and

25 Ron Buch.

1          MR. BUCH:  Ron Buch for the Thulins.

2          THE COURT:  Any additional legal argument to be made

3   with regard to the Thulin case that wasn't previously made and

4   acknowledged in the Potter case or any additional facts to

5   bring to light?

6          MR. ARMGARDT:  Your Honor, only that there was no

7   objection filed to the motion to -- well, the UST said she was

8   fine with closing the case and then the Court had declined but

9   I believe citing a wage garnishment.  But we submit that given

10  the U.S. Trustee's statement that she was fine with closing the

11  case, that it ought to be closed.

12         MR. SKAGGS:  Your Honor, for the U.S. Trustee, we had

13  discovered the wage garnishment issue on the record, so we

14  haven't been able to obtain -- show that the wage garnishment.

15  The lawsuit was commenced in January of 2019.  A judgment was

16  entered in June of 2019, and a garnishment started in August of

17  2019 with the Thulins' first paycheck of September 13th, 2019

18  being subject to that wage garnishment.

19         Now if we keep those dates in mind and look at the

20  statement of financial affairs, Paragraph 16, it shows that the

21  fees were paid in full to UpRight Law on April 12th of 2019.

22  So the fees were paid in full while that case was pending and

23  before a judgment was entered, and yet the case still did not

24  get filed until after the garnishment went into effect and the

25  case didn't actually get filed until January 31st of 2020.

63

1    So this is a case that we do need to look into and

2 there's sufficient reasons to keep this case open.

3    THE COURT: Okay. The Court looked at the facts on

4 this case and you are correct, Mr. Armgardt, the Court was

5 concerned about a garnishment that happened. The filing fees

6 were $1,725, once again, significantly more than Mr. Buch

7 usually charges. And they were paid for -- in a relatively

8 short period, actually. They were paid from December to got

9 paid by April of 2019. They started in December 2018. They

10 were paid in full in April 2019. But yet, it wasn't until

11 January 31st of 2020, over nine months later, that the case

12 actually gets filed.

13    And during that time frame, a small claims action was

14 commenced and the wages of the debtor were garnished to the

15 tune of $737.36. And it just baffles the Court as to what

16 happened here, why did this case linger so long in the hallows

17 of UpRight Law Firm when their client is suffering from a wage

18 garnishment.

19    So for those reasons, I'm denying the motion to close

20 in both cases and directing the U.S. Trustee to examine what

21 happened here and why the debtors' case wasn't filed earlier.

22 For those reasons, the motion to close will be denied, and a

23 written order we'll enter.

24

25    Next case, please.

64

1          COURTROOM DEPUTY:  Docket Number 17, United States
2  Trustee versus Richard and Jeanette Davis and Ron Buch.
3          MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.
4          MR. ARMGARDT:  Charles Armgardt for UpRight Law and
5  Ron Buch.
6          MR. BUCH:  Ron Buch for the Davises.
7          THE COURT:  All right.  Any additional legal argument
8  or additional facts to bring to the Court's attention one way
9  or the other in the Davis case?
10          MR. SKAGGS:  No, Your Honor.
11          MR. BUCH:  Judge, Ron Buch here.  Just for the
12  record, this is a case that was filed in June of 2018 by Mike
13  Curry (phonetic).  And I was not brought into the case until
14  January of 2019.  That's just for the record.
15          THE COURT:  Okay.  I appreciate that.  I remember
16  this was one that dealt with Mr. Curry.
17          MR. BUCH:  Sure.
18          THE COURT:  Okay.  Anything else then, Mr. Skaggs?
19          MR. SKAGGS:  No, Your Honor.
20          THE COURT:  Okay.  We do note the case was filed on
21  June 26th, 2018, and the U.S. Trustee filed a motion for Rule
22  2004 exam with regard to Mr. Buch which was granted on November
23  5th, 2019.  And the Court -- it's unclear to the Court whether
24  the exam took place because it was after objection and a
25  protective order was entered.

65

1    　　　　　The debtors weren't employed at the time of filing.

2    Schedule I shows they had zero income.  The statement of

3    financial affairs shows that they received $15,246 in

4    unemployment benefits from January 18th to the date of filing,

5    June 26th, 2018.  And we didn't know an itemization of fees in

6    this case.  And I think it was just the delays that brought

7    this to the Court's attention.  And for that reason, we didn't

8    have an itemization of fees and I don't know if it's possible

9    to get one, Mr. Buch.  I know you (indiscernible) --

10   　　　　　MR. BUCH:  I've got one.

11   　　　　　THE COURT:  -- 2020.

12   　　　　　MR. BUCH:  Yeah, I got one from my entry day.  I can

13   provide that very quickly.

14   　　　　　THE COURT:  Is there any additional itemization that

15   UpRight can file with regard to Mr. Curry's service?

16   　　　　　MR. ARMGARDT:  I'm not entirely sure.  But it could

17   be looked into.

18   　　　　　THE COURT:  Okay.

19   　　　　　MR. SKAGGS:  Your Honor, we did get a 2004 exam

20   granted, but yet we have not received the documents from

21   UpRight.  Maybe if they produced the documents, we can see that

22   maybe no additional action is necessary.  We did take that

23   position in three cases that were recently closed by the Court.

24   So --

25

66

1          THE COURT:  Okay.  What I think I want to do on this
2   one is I'm going to continue this motion to close.  I'm going
3   to give UpRight and Mr. Buch 30 days to provide an itemization
4   of fees so the Trustee can have something to look at and the
5   Court could have something to look at.  And then let's reset
6   this for -- Jake, give me a date early in November, maybe
7   second week of November.

8          COURTROOM DEPUTY:  We can do Tuesday, November 10th.

9          THE COURT:  Okay.  Let's reset this motion to close
10  for November 10th.  All right.  That'll be at 9:00 --

11         MR. SKAGGS: Your Honor?

12         THE COURT:  -- by phone.  Does that work for -- date
13  work for everyone?

14         MR. BUCH:  Yes.

15         MR. SKAGGS:  It does for the U.S. Trustee.  If I can
16  also ask that we order UpRight to produce the documents under
17  the Rule 2004 exam that was granted.  Again, that does provide
18  us with additional valuable information to review.

19         THE COURT:  Okay.

20         MR. ARMGARDT:  Your Honor, we can -- I'm sorry, I
21  didn't mean to interrupt.  May I?

22         THE COURT:  Sure.

23         MR. ARMGARDT:  I was going to say we've been
24  producing documents within the time frames set forth in the
25  orders for Rule 2004 exams.  Really the way it's been working

67

1  is there's a motion for exam, and included in that is a request

2  for documents to be produced within 30 days.  And then Your

3  Honor has granted the motion for Rule 2004 exam and then so

4  we've been proceeded to produce documents within the 30 days.

5          I apologize for not having top of mind exactly where

6  we are with the Davis case, but I believe that we have been

7  complying with the time deadlines.  And so --

8          THE COURT:  Okay.  Well then, to the extent you have

9  or haven't, please do so within 30 days along with the fee

10  itemization.  And then maybe this case will go away once the

11  Trustee has an opportunity to look at it.

12          All right.  Next case, please.

13          COURTROOM DEPUTY:  Docket Number 18, United States

14  Trustee versus Kerri Scott and Ron Buch.

15          MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

16          MR. ARMGARDT:  Charles Armgardt for UpRight Law and

17  Ron Buch.

18          MR. BUCH:  Ron Buch for Ms. Sierra Scott.

19          THE COURT:  Okay.  Any additional legal argument or

20  facts that parties would like to bring to the Court's

21  attention?

22          MR. ARMGARDT:  No, Your Honor,

23          THE COURT:  All right.  The Court notes for the

24  record that UpRight was paid $1,675 in attorney's fees in this

25  case for a period.  The debtors took eight months to pay that

1  from April 3rd, 2018 through December 19th, 2018.  The case was

2  then filed about two months later on February 15th, 2019.  The

3  U.S. Trustee did file a motion to take the 2004 exam of the

4  debtor's counsel, Ron Buch, which was granted on November 5th.

5  A stipulated order was entered on March 25th, 2020, a

6  protective order.

7        But it was unclear to the Court whether the exams

8  have taken place, and no itemization of fees was ever filed in

9  this case, leaving the Court without a lot of information to go

10  on here.

11        Have you had an opportunity to take the 2004 exam,

12  Mr. Skaggs?  Did we lose Mr. Skaggs?  Oh, you were here.

13        MR. SKAGGS:  Your Honor, I'm sorry.  I was muted.

14  Yes, I muted myself temporarily there.  We have not taken the

15  examination of Ms. Scott.  We would like to do so.  Candidly,

16  we're having issues now with getting the examinations done.

17        I know Mr. Buch has got some issues that prevent him

18  from necessarily meeting with people, so we're trying to work

19  through those.  Hopefully, we have in another case, we do have

20  a Microsoft Teams video conference examination set in early

21  October, so hopefully with that, we will start conducting more

22  of these examinations.

23        THE COURT:  Okay.  All right.  Well, based on that

24  fact and the time gap frames here and the Court wondering why

25  the fee is so much more, the motion to close the case will be

69

denied at this time.  Maybe at the 2004 exam, you want to --
the Trustee will file a motion to close.  I don't know.  But
please try to keep these moving forward.  I know these are
difficult times.  So but for the reasons stated, the motion to
close case will be denied and a written order we'll enter.

        Next case, please.

        COURTROOM DEPUTY:  Docket Number 19, United States
verus Mark and Kelly Clark and Ron Buch.

        MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

        THE COURT:  I want to --

        MR. ARMGARDT:  Charles Armgardt for --

        THE COURT:  Excuse me, I'm sorry.  I want to go back
in the Scott case.  You did not have an itemization of fees in
that case, and I'd like an itemization filed within 30 days on
the Scott case.

        MR. BUCH:  I've got it ready to go, Judge.  We can do
that very quickly for you.

        THE COURT:  Okay.  Great, thank you.  Thank you.

        All right.  Now, I'm sorry, let's go back to the
Clark case.

        Okay.  Does anyone have any additional legal argument
or additional facts they'd like to bring to the Court's
attention?

        MR. ARMGARDT:  No, Your Honor.

        THE COURT:  Once again, for the record, I'm referring

1  additional legal arguments to the Potter case.  Okay.  The

2  Court will note for the record that 2004 examination of Ron

3  Buch and the debtors was granted on November 5th, 2019.  A

4  protective order was entered with regard to that, a stipulated

5  protective order on March 24th, 2020.  And it's unclear to the

6  Court whether that exam has ever occurred.

7         The debtors paid $1,775 in attorney's fees to UpRight

8  for the period from May 3rd, 2019 through May 15th, 2019, so a

9  relatively quick time frame.  The case was filed, also,

10 relatively quickly on May 29th, 2019.  So the debtors had a

11 household of four.  They had a combined monthly income on

12 Schedule I of $3,159.40, and they would have qualified for an

13 IFP if one had been filed for it just based on the numbers.

14 Now there may have been other factors that would cause it to be

15 denied, but looking at the schedule, it looks like they would

16 have qualified but yet no IFP application was filed.

17        Has the 2004 exam taken place in this case?

18        MR. SKAGGS:  Again, Your Honor, no, it has not taken

19 place.  The issues of the U.S. Trustee's fees are the fees

20 compared to what Mr. Buch typically charges plus that IFP issue

21 that the Court has raised.

22        MR. BUCH:  And, Your Honor, I'd like to thank you for

23 your comment earlier about the fee waiver.  After that last

24 hearing where I chimed in about not being aware of fee waivers

25 in these cases, I kind of checked around and I know of the

1  largest filer in our district indicated that he was not aware

2  that you could do fee waivers.  But I checked on the other side

3  of the state and, apparently, it's very popular over there to

4  do that in the right circumstances.  So I want to go on the

5  record standing corrected on that issue, and I thank you for

6  your comments earlier.

7          THE COURT:  Okay.  All right.  When do you think you

8  will be able to get the 2004 exam conducted or how much longer

9  do you think this case will need to -- you'll need to look at

10 this case, Mr. Skaggs?

11         MR. SKAGGS:  Given availability of everybody,

12 hopefully within two or three days we could conduct the

13 examination.

14         THE COURT:  Okay.  At this point in time then, I'm

15 going to deny the motion to close the case.  And we'll have a

16 written order to issue, but I once again urge the parties to

17 try to schedule these things as quickly as they can.  I

18 understand the circumstances as they are, but yet everyone's

19 anxious to get these cases moving.

20         All right.  Next case, please.

21         COURTROOM DEPUTY:  Docket Number 20, United States

22 Trustee versus Ariel Mounce and Ron Buch.

23         MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

24         MR. ARMGARDT:  Charles Armgardt for UpRight Law and

25 Ron Buch.

72

1        MR. BUCH:  Ron Buch for Ms. Mounce.

2        THE COURT:  All right.  Any additional legal argument

3   or facts to be brought to the Court's attention in the Mounce

4   case?

5        MR. ARMGARDT:  No, Your Honor.

6        THE COURT:  All right.  The Court notes for the

7   record that the United States Trustee filed a motion for a 2004

8   exam of the debtor and Ron Buch, which was granted on November

9   5ht, 2019, and a stipulated protective order was entered on

10  March 25th, 2020.  It's unclear whether the exam has occurred

11  at this point.

12       The debtors originally paid $1,675 in attorney's fees

13  to UpRight from August 1st, 2018 through March 29th, 2019, so a

14  period of seven months.  The case was then filed about three

15  months later on June 26th, 2019.  Pursuant to Schedule I, the

16  debtor's monthly income was $3,104 solely from the debtor's

17  Social Security and Social Security for her two daughters and

18  her son.  The household size is five, so the debtors would have

19  qualified -- the debtor would have qualified for a fee waiver

20  here.

21       So, once again, the Court is left to wonder, I don't

22  know if the 2004 exam's taken place, I wonder why the fee was

23  so high, and why an IFP wasn't filed.  So are we -- is this a

24  2004 exam that has taken place?  Educate the Court on this one.

25       MR. SKAGGS:  Your Honor, the exam has not taken

1  place.  We would like to still take the examination.  In this

2  case, we have received some documents.  We received 172 pages

3  of documents.  We have not received any training materials that

4  were requested in this particular case.  Hopefully, we can get

5  this examination as with the others conducted soon.

6         THE COURT:  Okay.  Based on the facts as set forth

7  today and in the record and legal arguments previously made,

8  the Court denies the motion to close the cases in both of these

9  -- or both motions in this case and, once again, direct the

10  parties to move as expeditiously as possible to get the 2004

11  exams taken and get these cases moving forward.

12         Next case, please.

13         COURTROOM DEPUTY:  Docket Number 21, United States

14  Trustee versus Harold and Lisa Lalumondiere and Ron Buch.

15         MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

16         MR. ARMGARDT:  Charles Armgardt for UpRight Law and

17  Ron Buch.

18         MR. BUCH:  Ron Buch for the Lalumondieres.

19         THE COURT:  Okay.  Any additional legal argument or

20  additional facts to bring to the Court's attention in the

21  Lalumondiere case?  No?

22         MR. ARMGARDT:  No, Your Honor.

23         THE COURT:  All right.  The Court notes for the

24  record United States Trustee filed a motion for 2004 exam of

25  Ron Buch and the debtor, which was granted on November 5th,

74

1  2019.  A stipulated protective order was entered on March 24th,

2  2020.  It's unclear to the Court whether the exam has occurred.

3          The debtors in this case paid $1,725 in attorney's

4  fees to UpRight from August 31st, 2018 through February 22nd,

5  2019, a period of six months.  And the case was filed -- it

6  took about approximately five months after that for the case to

7  get filed on July 3rd, 2019.  We do not have an itemization of

8  fees in this case, and I would like that filed within 30 days.

9          And has the Trustee taken the 2004 exam in this case?

10         MR. SKAGGS:  No, Your Honor.  Again, we would also

11 like that itemized fee statement and hopefully after that is

12 produced, we can then conduct the examinations in short order.

13         THE COURT:  Mr. Buch, will you be able to get that

14 completed in 30 days?

15         MR. BUCH:  I have that right in front of me,

16 actually, Judge.  I can do it quicker than that certainly

17 within 30.

18         THE COURT:  Okay.

19         MR. ARMGARDT:  I'm sorry, Your Honor.  I just wanted

20 to point out that where there isn't a fee -- a statement in the

21 fee filed, it isn't because of noncompliance with an order.

22 This isn't an order to do it.  So I may not -- I understand

23 where the Court wants to go with that, but I just wanted to

24 dispel any notion that a deadline or a direction of the Court

25 had been missed.

1          THE COURT:  Okay.  No blame is being cited here as

2   the Court would just like to have an itemization of fee.

3          MR. ARMGARDT:  And then --

4          THE COURT:  So -- okay.

5          MR. ARMGARDT:  And then the other thing I wanted to

6   point out is these statements of fees are -- it's a

7   compilation.  So while Mr. Buch has information to put into the

8   statement, there's other information to be put in.  And so

9   while I appreciate Mr. Buch saying he could do it real quickly,

10  it needs to be all put together because there is time logs and

11  tasks performed by others at UpRight.  So I just wanted to

12  point that out, too, that we --

13         THE COURT:  Okay.  Well, if for some reason you

14  can't, please jump in here, Mr. Armgardt.  I'm assuming that

15  when Mr. Buch says he can that that is representative because

16  he is the partner of UpRight.  So I'm going to assume it's

17  representative of UpRight, not just him alone.  So if you

18  can't, please jump in and say I need more time, okay?

19         MR. ARMGARDT:  I just wanted to --

20         THE COURT:  I'm not asking someone to do something

21  that they can't do so you tell me.  I know there's a lot of

22  cases.  And really, the Court knows because the Court not only

23  has these, it has all of the other cases in its -- on its

24  docket and trying to get these to move along and to come to a

25  conclusion.  So you tell me can you do it in 30 days?

76

1          MR. ARMGARDT:  Yes, Your Honor.  I just wanted to
2     make sure that I did have the 30 days.

3          THE COURT:  Okay.  Yes, you have 30 days, yes.  When
4     I asked for the itemization of fees, it's for the UpRight Law
5     Firm.  So Mr. Buch is a partner in that firm, and when he says
6     that, I assume we can get it.  And if you need to add or some
7     other UpRight Law Firm that needs to add something to this
8     that's not Mr. Buch's UpRight Law Firm, you know, I'm not aware
9     of that.  But you let me know if it's not possible to get those
10    fees done.  Okay.

11         Based on the reasons as set forth here, the motion to
12    close will be denied, and a written order we'll enter.

13         Next case, please.

14         COURTROOM DEPUTY:  Docket Number 22, United States
15    Trustee versus Jason Turner and Ron Buch.

16         MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

17         MR. ARMGARDT:  Charles Armgardt for UpRight Law and
18    Ron Buch.

19         MR. BUCH:  Ron Buch for Mr. Turner.

20         THE COURT:  All right.  We have, once again, motions
21    to close the case filed in the Turner case and objections filed
22    by the U.S. Trustee.  Are there any additional legal arguments
23    the parties would like to make or facts to bring to the Court's
24    attention?

25         MR. ARMGARDT:  No, Your Honor.

1        THE COURT:  All right.  Let the record reflect the

2 United States Trustee filed a motion for 2004 exam of Ronald

3 Buch the debtor which was granted on November 5th, 2019.  A

4 stipulated protective order was entered on March 25th, 2020.

5 It is unclear whether the exams have occurred.

6        The debtors paid $1,674 in attorney's fees to UpRight

7 from December 15th, 2017 to April18th, 2019, a period of about

8 16 months.  The case was filed several months later on July

9 26th, 2019.  The statement of financial affairs indicates that

10 within one year of filing, Mr. Turner was a party to two small

11 claims lawsuits with Brother Loan and Finance Company and

12 Crystal Rock Finance, LLC.  Both were marked as concluded and

13 judgment.  The debtor's assets total $5,565, which included a

14 2007 Chevrolet valued at $3,775.

15        The Court notes that we haven't requested an

16 itemization of fees yet, but we would like -- I would like one

17 and if one could be filed within 30 days.  Is that possible?

18        MR. ARMGARDT:  Yes, Your Honor.

19        THE COURT:  Okay.  And, Mr. Skaggs, has the 2004 exam

20 occurred yet?

21        MR. SKAGGS:  It has not, Your Honor.

22        THE COURT:  Okay.  I'm once again directing the

23 parties to try to get these set as soon as possible.

24        All right.  For the reasons set forth, the facts

25 stated on the record, the Court denies the motion to close the

1  case.  The Court once again wonders if the high fee that was

2  paid compared to what Mr. Buch usually charges and what value

3  was added, and so a written opinion will be issued with regard

4  to denying the motion for closing the case.  And 30 days on the

5  fee itemization.

6          Next case, please.

7          COURTROOM DEPUTY:  Docket Number 23, United States

8  Trustee versus Donald Lankford and Ron Buch.

9          MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

10         MR. ARMGARDT:  Charles Armgardt for UpRight Law and

11 Ron Buch.

12         MR. BUCH:  Ron Buch for Mr. Lankford.

13         THE COURT:  All right.  We're here on the Lankford

14 case.  Once again, two motions to close with objections filed

15 by the U.S. Trustee.

16         Any additional legal arguments the parties would like

17 to make or facts the Court -- the parties would like to bring

18 to the Court's attention?

19         MR. ARMGARDT:  No, Your Honor.

20         THE COURT:  Okay.  No statements having been made,

21 the Court finds that the U.S. Trustee filed a motion for 2004

22 exam of Ron Buch and the debtor in this case, which was granted

23 on November 5th, 2019.  A stipulated protective order was

24 entered on March 24th, 2020.  It's unclear whether the exams

25 have occurred yet.

1   The debtor paid $1,375 in attorney's fees to UpRight

2   from June 14th, 2018 to November 9th, 2018, and the case was

3   filed the following year, nine months later it took to get the

4   case filed on August 15th, 2019.  The debtor lists the

5   following cases that it was part of within the one year prior

6   to filing bankruptcy, and that was the case filed against the

7   debtor, a collective action by Northern Leasing Systems, which

8   was pending at the time the case -- bankruptcy was filed.  A

9   case filed by First America Credit Union which indicates -- the

10  SOFA indicates that it was an arbitration but it concluded in a

11  judgment, and another case filed by First America Credit Union

12  which was a small claims action that was pending all during

13  this period while the debtor had paid in full and was

14  (indiscernible) to get his case filed.

15          So based on those reasons and -- has the 2004 exam

16  happened yet?

17          MR. SKAGGS:  No, Your Honor.

18          THE COURT:  Okay.  The Court notes the 2004 exam has

19  not occurred yet, despite a stipulated protective order to do

20  so.  Based on that, the motion to close the case will be

21  denied.  A written order we'll enter setting forth the Court's

22  reasoning.

23          Next case, please.

24          COURTROOM DEPUTY:  Docket Number 24, United States

25  Trustee versus Megan Beckemeyer and Ron Buch.

1             MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

2             MR. ARMGARDT:  Charles Armgardt for UpRight Law and

3  Ron Buch.

4             THE COURT:  All right.

5             MR. BUCH:  Ron Buch for Ms. Beckemeyer.

6             THE COURT:  Okay.  We're here on the two motions to

7  close in the Beckemeyer close with objections filed by the

8  United States Trustee.  Would either party like to make

9  additional legal argument or bring any additional facts to the

10 attention of the Court?

11            MR. ARMGARDT:  No, Your Honor.

12            THE COURT:  Okay.  The Court will note for the record

13 that the debtor paid $1,675 from September 14th, 2018 through

14 May 3rd, 2019, a period of about eight months.  And the case

15 was filed over four months later on September 20th, 2019.

16            I don't believe we have -- we did get a statement of

17 itemization of fees filed in this case.  And reviewing that, it

18 looks like a non-attorney had phone calls with the debtor

19 several times, but the debtor did not speak with Mr. Buch for

20 quite a period of time until a complaint call was made.  And

21 then he met with the debtor in person for the first time on May

22 10th, 2019 and did not speak with an attorney again until he

23 filed the case on September 20th, 2019.  In fact, he didn't

24 speak with an attorney that brings a question to the Court here

25 until September 20th, 2019.

1    Nonetheless, has the Trustee -- the Trustee has not

2  filed a motion to take a 2004 exam in this case.  Does the

3  Trustee have any position on this case?

4    MR. SKAGGS:  The Trustee does intend to file a

5  motion.  We have made a request of UpRight to conduct the

6  examination; that was denied, which is one of the requirements,

7  one of the preliminary steps we have to take in accordance with

8  the local rules.  So we have not yet filed a motion for 2004,

9  but we can do so within the next two weeks.

10    THE COURT:  Okay.  All right.

11    MR. BUCH:  Your Honor, Ron Buch here.

12    THE COURT:  Yeah.

13    MR. BUCH:  Can I correct something for the record?

14  When we --

15    THE COURT:  Sure.

16    MR. BUCH:  -- put our fee itemization together, if

17  you look at the entry May 3rd of 2019, which shows my compliant

18  call with Ms. Beckemeyer, we discovered just yesterday that I

19  had made -- we had made a mistake on several of these, and this

20  is one of them.  That compliance call was made on September

21  17th, 2018.  And I just wanted to clarify that that I spoke

22  with her three days after her first payment date.  If you look

23  at that date there, it looks like I didn't talk to her until

24  she was finished paying.

25    THE COURT:  Okay.  All right.  We'll make that

1 correction for the record then. Thank you, Mr. Buch.

2         MR. BUCH: Thank you, Judge.

3         THE COURT: All right. Okay. The Trustee -- the

4 Court, based on the Trustee's request to take a 2004 exam and

5 the questions the Court has about the fee that was charged and

6 the limited information that was available in the fee statement

7 that was issued, which indicates a lot of non-attorneys

8 advising the debtor between the time Mr. Buch apparently

9 originally spoke to the debtor and then when he finally talked

10 to her again some, I don't know, about nine or ten months later

11 in May, raises questions to the Court about who was helping or

12 assisting the debtor during that time frame, whether she had

13 any legal advice at all while making these payments.

14         For that reason, the motion to close will be denied,

15 and we'll have a written order to enter.

16         Next case, please.

17         COURTROOM DEPUTY: Docket Number 25, United States

18 Trustee versus David Miller and Ron Buch.

19         MR. SKAGGS: Mark Skaggs for the U.S. Trustee.

20         MR. ARMGARDT: Charles Armgardt for UpRight Law and

21 Ron Buch.

22         MR. BUCH: Ron Buch for Mr. Miller.

23         THE COURT: All right. Any additional legal argument

24 or facts the parties would like to bring to the Court's

25 attention on this one that has not previously been made in the

1    Potter case?

2         MR. ARMGARDT:  No, Your Honor.

3         THE COURT:  Okay.  All right.  Not hearing from the

4    parties, the Court will note for the record the  United States

5    Trustee filed a motion for 2004 exam of Ron Buch and the

6    debtor, and the motion was granted on April 28th, 2020.  A

7    written order was issued on August 13th, 2020.

8         For the record, the debtor paid $1,525 in attorney's

9    fees to UpRight from the period from August 2nd, 2019 to August

10   16th, 2019, so it was paid relatively quickly.  But the case

11   wasn't filed until two months later, so it raises questions.

12   It looks like the debtor needed to file.  It paid pretty fast

13   compared to the normal cases we see here filed by UpRight, but

14   yet the case wasn't filed until two months later.

15        And what's concerning to the Court is when the Court

16   looks at the statement of financial affairs, it shows within

17   the 90 days prior to filing bankruptcy, the debtor paid three

18   unsecured creditors the amount of $3,725.37, which once against

19   begs the questions of who's giving the debtors legal advice

20   during this period and, you know, why are they paying such a

21   significant amount to unsecured creditors.

22        So based on that -- has -- my guess is a 2004 exam is

23   probably not been taken place in this case.  Is that correct,

24   Mr. Skaggs?

25        MR. SKAGGS:  Yes.  That is correct, Judge.  We just

1  received the documents on September 11th, so.

2          THE COURT:  Okay.  All right.

3          MR. SKAGGS:  Which was in a timely manner.  It's just

4  it has not been taken, no.

5          THE COURT:  Okay.  I appreciate that.  Based on that,

6  the Court will deny the motion to close the case based on the

7  facts as set forth and the fact the 2004 exam has not taken

8  place yet.  The motion to close will be denied; a written order

9  we'll issue.

10          Next case, please.

11          COURTROOM DEPUTY:  Docket Number 26, United States

12  Trustee versus Jamie and Angela Brucker and Ron Buch.

13          MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

14          MR. ARMGARDT:  Charles Armgardt for UpRight Law and

15  Ron Buch.

16          MR. BUCH:  Ron Buch for the Bruckers.

17          THE COURT:  Any additional legal argument or facts

18  that would like to be brought, the parties would like to bring

19  to the Court's attention?

20          MR. ARMGARDT:  No, Your Honor.

21          THE COURT:  Okay.  The Court notes for the record

22  that the United States Trustee filed a motion for 2004 exam of

23  Ron Buch and the debtors, which was granted on April 28th,

24  2020.  A written order was currently entered on August 4th,

25  2020.

1     The debtors paid $1,725 in attorney's fees to UpRight

2  from July 6th, 2018 to February 28th, 2019, a period of over

3  seven months.  Their case wasn't filed though until eight

4  months later on October 30th, 2019.  A statement of financial

5  affairs shows that during the one-year period prior to filing

6  bankruptcy, creditors took collection actions against the

7  debtors.  Kathy Oliver obtained a judgment on a small claims

8  suit filed in 2018, and she subsequently garnished the debtors'

9  wages in the amount of $1,291 during that period.  Therefore,

10 the debtors were subjected to a wage garnishment at the time

11 when they were represented by UpRight.

12     The statement of financial affairs further provided

13 that during the year prior to filing bankruptcy, Prestige

14 Financial Services repossessed property belonging to the

15 debtors valued at $2,343.32.

16     The fee statement that was submitted to the Court

17 reflects that the debtor initially spoke with a non-attorney

18 UpRight staff member on June 29th, 2018, and on that date

19 corresponded by e-mail with UpRight staff attorney Jacob Brown,

20 it quotes regarding creditors is what it said.  Notations were

21 made by a non-attorney staff member on February 12th, 2019,

22 indicating that non-attorney UpRight staff members were

23 advising the debtor regarding credit or collection efforts

24 prior to filing bankruptcy.  On that date, staff member Marty

25 Labelle lodged a six-minute call described as "phone

1  conversation with client regarding garnishment."

2        So this really is concerning the Court because it

3  appears that Mr. Buch isn't being advised of these calls.

4  They're going to some UpRight staff member who is a non-

5  attorney who's advising the Court -- or advising, of course,

6  the debtor during this period and the debtor's getting

7  garnished to the tune of $1,291.37 as well as having property

8  repossessed.  And for these reasons and the fact that I'm going

9  to assume that the 2004 exam has not taken place yet, has it,

10  Mr. Skaggs?

11        MR. SKAGGS:  This is set for Tuesday, October 6th for

12  a video examination.

13        THE COURT:  Okay.  So the factors I've stated forth

14  in the record as well as the fact the 2004 exam has not taken

15  place yet, the motion to close the case will be denied.  A

16  written order to enter.

17        Next case, please.

18        COURTROOM DEPUTY:  Docket Number --

19        MR. BUCH:  Judge, can we hold on Brucker for just a

20  moment?  This is --

21        THE COURT:  Okay.

22        MR. BUCH:  -- another one of those where we have an

23  erroneous entry showing as March 1, 2019 for the compliance

24  call.  That compliance call was actually July 3rd, 2018

25  conducted by Mr. Miller, William A. Miller.

1    THE COURT:  Okay.

2    MR. BUCH:  I wanted to correct that for the record.

3    THE COURT:  We'll show that there was a compliance

4 call early on, but despite that, attorneys were not involved

5 during the course of the garnishment.

6    Okay.  On to the Edwards case.

7    COURTROOM DEPUTY:  Docket Number 27, United States

8 Trustee versus Arnold and Tracy Edwards and Ron Buch.

9    MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

10    MR. ARMGARDT:  Charles Armgardt for UpRight Law and

11 Ron Buch.

12    MR. BUCH:  Ron Buch for the Edwards.

13    THE COURT:  All right.  Once again, we have a motion

14 to close with objections filed by the Trustee.  Any additional

15 legal argument or facts that the parties would like to bring to

16 the Court's attention?

17    MR. ARMGARDT:  No, Your Honor.

18    THE COURT:  All right.  The record reflects that the

19 United States Trustee filed a motion for 2004 exam of Ron Buch

20 and the debtors.  The motion was granted on April 28th, 2020.

21 A written order was entered on August 12th, 2020.

22    The debtors paid $1,575 in attorney's fees to UpRight

23 from June 21st, 2019 to August 23rd, 2019.  The case was filed

24 on October 30th, 2019, two months later.  So things are moving

25 along smoothly there.

1     But based on the income information, the monthly

2 income of $3,445.30 and the household size information of size

3 of six, pertaining to the bankruptcy schedules, it appears that

4 the debtors may have been eligible for a fee waiver.  It's

5 unclear whether the debtors were aware of that option.  The

6 debtors' assets were relatively modest.  Total assets were

7 $4,429.02, which included a 2007 Dodge caravan of $2,336.

8     The itemization of fees further indicates that the

9 debtors' phone was disconnected on October 23rd, 2019.  The fee

10 statement further indicates that non-attorney staff members

11 were advising the debtors regarding garnishment efforts prior

12 to filing the bankruptcy.  On June 18, 2019, a non-attorney

13 staff member, Marty Labelle had a six-minute conversation with

14 the debtors described as phone comments with client regarding

15 creditors.  On June 13th, 2019 -- I'm sorry, June 3rd, 2019,

16 non-attorney staff member Josiah Lape, L-A-P-E, and Marty

17 Labelle each logged six-minute conversations with debtors

18 described as phone conversation with clients regarding general

19 questions and phone conversation with client regarding

20 potential garnishment.  And then on August 9th, 2019, non-

21 attorney staff member Adrianna Bonny lodged a six-minute

22 conversation described a phone conversation with client

23 regarding garnishment.

24     So we have this period of time here where the debtors

25 are getting their payments in, almost have it paid in full, and

1  no attorney from UpRight is responding to them.  They're

2  getting the services only of non-attorney staff members, which

3  raises questions in the Court's mind.

4          Has the 2004 exam been taken in this case?

5          MR. SKAGGS:  Your Honor, it has not.  We just

6  received the documents on September 11th.  They were provided

7  in a timely manner in accordance with the order granting the

8  motions for 2004.  So, hopefully, we can get those scheduled

9  soon.

10          THE COURT:  Okay.  So --

11          MR. BUCH:  Your Honor?

12          THE COURT:  Yes, Mr. Buch?

13          MR. BUCH:  I'm sorry.  This is is another one --

14  we've got several of these, and I apologize.  This is another

15  one if you look at the August 26, 2019 entry, that shows the

16  compliance call.  We checked the record on that.  That was

17  actually June 4th, 2019.

18          THE COURT:  Okay.

19          MR. BUCH:  Thank you.

20          THE COURT:  I'm not understanding you now, Mr. Buch.

21  The compliance call was made on August 26th, 2019?

22          MR. BUCH:  No.  No, no, no.  That's an erroneous

23  entry.

24          THE COURT:  Okay.

25          MR. BUCH:  The date on that should be June 4th of

1  2019.

2          THE COURT:  Okay.  I don't have that in front of me.

3  That's why I had trouble understanding.  I'm sorry.

4          MR. BUCH:  Okay.

5          THE COURT:  So June 4th you had your compliance call,

6  okay.

7          MR. BUCH:  Yes.  Thank you.

8          THE COURT:  Then after that, it was all staff members

9  and non-attorneys.  Okay.

10          For the reasons set forth in the record and the fact

11  that the 2004 exam has not taken place, the documents are at

12  least being produced so it's moving forward, the motion to

13  close the case in the Edwards case will be denied.  A written

14  order we'll enter.

15          Next case, please.

16          COURTROOM DEPUTY:  Docket Number 28, United States

17  Trustee versus Rachael Hohensee and Ron Buch.

18          MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

19          MR. ARMGARDT:  Charles Armgardt for UpRight Law and

20  Ron Buch.

21          MR. BUCH:  Ron Buch for Ms. Hohensee.

22          THE COURT:  Okay.  We've got two motions to close

23  filed in the Hohensee case with objections filed by the United

24  States Trustee.  Do the parties have any additional legal

25  argument they'd like to make they haven't made on the record

1 today or any facts they'd like to bring to the Court's

2 attention in the Hohensee case?

3          MR. ARMGARDT:  No, Your Honor.

4          THE COURT:  Okay.

5          MR. BUCH:  I need to add again, Judge, here, the

6 compliance call is listed as September 9th, 2019.  The actual

7 call was made on January 23rd, 2019.  I apologize for this,

8 Judge.  My -- when we looked at the documents, it was in the

9 UpRight system, we misread the dates, and that's why you're

10 seeing some of these here.  We've got a couple of more yet.  I

11 apologize.

12          THE COURT:  Okay.  Was this based on internal records

13 that you had noting the conversation on that particular date?

14          MR. BUCH:  Yes.  Yes.  We keep logs of -- well, yeah.

15 Yes.

16          THE COURT:  Okay.  All right.  The Court notes for

17 the record that the United States Trustee filed a motion for

18 2004 exam of Mr. Buch and the debtor.  The motion was granted

19 on April 28th, and a written order was entered in August 2020

20 granting that motion.

21          The debtors paid $1,475 in attorney's fees to UpRight

22 from January 23rd, 2019 to  September 4th, 2019, a period of

23 approximately nine months.  Two months later on November 13th,

24 2019, the case was filed.  During the time period in which the

25 debtor was making payments to UpRight, debtor's Chevy Avalanche

1 was repossessed. That was in April of 2019. A state court

2 judgment was entered against her.

3         The fee statement reflects that the debtor on May

4 30th, 2019 when apparently questioned about the status or

5 payments to UpRight made a cancellation request to this non-

6 debtor UpRight staff person she was talking to. UpRight then

7 had a non-attorney staff person reach out to the debtor on June

8 13th, 2019 to inquire about the status of her payment. It's

9 unclear why as she didn't speak with an attorney concerning

10 proceeding with the filing of her bankruptcy case or not.

11         The debtor's total assets were $3,957.85 which

12 included a 2001 Ford Escort valued at $700 and a mobile home

13 valued at $1,000. The assets were either fully exempt or

14 something that it would be difficult for a credit to reach.

15 Despite that, this case was filed.

16         So the Court -- you know, the Court is left to wonder

17 why the fee was higher than the usual for Mr. Buch to file,

18 what value was added by UpRight in their portion of the

19 representation or the fact that UpRight creates an additional

20 value that Mr. Buch's firm alone doesn't have, and why these

21 repossessions took place and this judgment took place during

22 the course of said representation without any entries of an

23 attorney from UpRight having advised the debtor on what to do.

24         For those reasons and the fact that -- has the motion

25 for 2004 exam taken place in this case?

93

1          MR. SKAGGS:  Again, Your Honor, we just received the

2 documents on September 10th.  They were produced in a timely

3 manner.  Hopefully, we can get the examinations done soon.

4          THE COURT:  Okay.  So noting for the record that the

5 2004 exam which was -- an order was entered allowing, has not

6 taken place.  For that reason and the facts stated forth on the

7 record, the motions to close will be denied.  A written order

8 we'll issue.

9          Next case, please.

10          COURTROOM DEPUTY:  Docket Number 29, United States

11 Trustee versus Tiffany Cannon and Ron Buch.

12          MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

13          MR. ARMGARDT:  Charles Armgardt for UpRight Law and

14 Ron Buch.

15          MR. BUCH:  Ron Buch for Ms. Cannon.

16          THE COURT:  Okay.  Any additional legal authority or

17 facts that the parties would like to bring to the Court's

18 attention on the Cannon case?

19          MR. BUCH:  Ron Buch here, Judge.  Once again, the

20 compliance call date was incorrect.  We've listed as February

21 22, 2019.  In reality, it was August 24, 2018.

22          THE COURT:  Okay.  Thank you for that.

23          All right.  Let the record reflect in this case the

24 U.S. Trustee filed a motion for 2004 exam of Ron Buch and the

25 debtors, and the motion was granted on April 28th, 2020.  A

94

1  written order was entered on August 11th, 2020.

2         The debtors paid $1,675 in attorney's fees to UpRight

3  from  August 23rd, 2018 over a six-month period to February

4  22nd, 2019.  The case was then not filed for another nine

5  months.  It was filed on November 26th, 2019.  The debtor's

6  debts totaled $12,715.30 which includes a state court judgment

7  that was entered against her in the amount of $3,415.58 during

8  the period in which she was paying UpRight for the fees to file

9  the case.

10         Based upon the income shown by the debtor's

11  bankruptcy schedule, for the period the debtor would have been

12  eligible for a fee waiver of bankruptcy filing fee.  Her

13  monthly income $232.42 along with SNAP benefits of $299.  It's

14  unclear whether the debtor was made aware of her option to

15  request that the bankruptcy filing fee be waived.  The debtor

16  only had $479.26 worth of assets scheduled.  The debtor's 2014

17  Ford Focus was repossessed on August 22nd, 2019.  This was

18  after she had already completed her payments to UpRight.

19         I'm going to assume that the 2004 exam has not taken

20  place in this case?

21         MR. SKAGGS:  That is correct, Your Honor.

22         THE COURT:  Okay.  Based on the fact --

23         MR. SKAGGS:  (Indiscernible).

24         THE COURT:  I'm sorry.  Go ahead.

25         MR. SKAGGS:  Yeah.  We just received the documents.

1  They were produced in a timely manner on September 10th.  So we

2  do hope to get the examination conducted, as well.

3       THE COURT:  Once again, the Court isn't faulting

4  anyone that these haven't taken place.  Once again, hoping the

5  parties can move it along.  But for the reasons set forth

6  through the Court's grave concerns about the high filing fee,

7  the nominal amount of assets this debtor had, almost judgment-

8  proof, why this case was filed, what took so long to file it,

9  why the debtor's car was repossessed, and the fact that 2004

10  exam hasn't been taken, the motions to close the case are

11  denied.  A written order we'll issue.

12       Next case, please.

13       COURTROOM DEPUTY:  Docket Number 30, United States

14  Trustee versus Ross and Mary VanDeventer and Ron Buch.

15       MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

16       MR. ARMGARDT:  Charles Armgardt for UpRight Law and

17  Ron Buch.

18       MR. BUCH:  Ron Buch for the VanDeventers.

19       THE COURT:  Okay.  Any other additional legal

20  argument to be made in this case or facts to be brought to  the

21  Court's attention?

22       MR. BUCH:  Judge, Ron Buch here.  This is a case that

23  began again with Mr. Curry.  We really missed the ball on this

24  one.  We showed the compliance call being conducted by me.

25  That was in March, March 4th of 2019.  That is incorrect.  The

1  compliance call was made by Mr. Curry on August 15th, 2018.

2  Again, I apologize for this inconvenience here.

3          THE COURT:  Okay.

4          MR. SKAGGS: Your Honor, can we get Mr. Buch and

5  UpRight to file an amended statement so it is clear?

6          MR. ARMGARDT:  Judge --

7          THE COURT:  Yeah, I think in this case we could use

8  an amended statement.

9          MR. ARMGARDT:  Yes, Your Honor.  I just learned of

10  these -- this situation this morning, and so yeah, that's

11  certainly what I would think makes sense is to have amended

12  statements of fees in these particular cases.

13          THE COURT:  Okay.  So if you would, please, in the

14  cases where Mr. Buch has stated there was an error, have an

15  amended statement of fees, that would probably be helpful to

16  both the Court and Mr. Skaggs in his review of these cases.

17          Let the record reflect here the United States Trustee

18  filed a motion for 2004 exam of Ron Buch and the debtor, which

19  was granted on November 5th, 2019.  A stipulated protective

20  order was entered on March 25th, 2020.  It's unclear whether

21  the exam has occurred.

22          The debtors paid $1,225 in attorney's fees to

23  UpRight, which is slightly more than Mr. Buch usually charges,

24  from a period from August 14, 2018 through February 22nd, 2019,

25  a period of six months.  And approximately two months later,

1 the bankruptcy was filed on April 24th, 2019.

2        The debtors' monthly income of $2,340.63 consists of

3 the first debtor's income of $1,913.63 and Social Security

4 benefits of the second debtor of $427.  The debtors' disabled

5 daughter lives with them, so their household is a size of three

6 making them eligible for a fee waiver as the guideline of a

7 household size of three is $2,666.25 at the time this case was

8 filed.

9        Once again, no fee waiver was requested.  The 2004

10 exam, has that been taken in this case?

11        MR. SKAGGS:  It has not, Your Honor.

12        THE COURT:  Okay.  Do you have a document you need to

13 take the 2004 exam?

14        MR. SKAGGS:  We do have the documents, and we do

15 intend to take the examinations.  Again, it's an issue of

16 getting those coordinated.

17        THE COURT:  I understand.  Okay.

18        For the reasons stated on the -- the facts stated on

19 the record and the fact the 2004 exam has not taken place,

20 despite a stipulated protective order that was entered back in

21 March 2020, the motion to close will be denied.  A written

22 order we'll enter.

23        Next case, please.

24

25        COURTROOM DEPUTY:  Docket Number 31, United States

1  Trustee versus Albert Johnson, II, and Ron Buch.

2            MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

3            MR. ARMGARDT:  Charles Armgardt for UpRight Law and

4  I'm hesitating because I perhaps erroneously thought that this

5  was a case handled by Mr. Ford.  I apologize for that, but

6  representing the partner attorney.

7            MR. BUCH:  And Ron Buch --

8            MR. ARMGARDT:  I'm sorry.  It is --

9            MR. BUCH:  -- Mr. Johnson.

10           MR. ARMGARDT:  I apologize.

11           MR. BUCH:  And, Judge, this will be my last

12 correction on the compliance call.  Once again, I apologize to

13 the Court and the parties.  It is listed as March 18 -- I'm

14 sorry, March 8th of 2019.  And, in fact, it was conducted on

15 August 24, 2018.

16           THE COURT:  Okay.

17           MR. BUCH:  And I'll be more than happy to correct

18 that issue.

19           THE COURT:  Okay.  If you would file --

20           MR. ARMGARDT:  So, Ron, are you saying -- Ron, are

21 you saying -- I'm sorry, Your Honor, but are you saying that

22 the second call did not take place at all then or are you just

23 changing the title of the call?

24           MR. BUCH:  No, I'm changing the date only.  And

25 you're right, the March 8th call did not exist.

1        MR. ARMGARDT:  Okay.

2        THE COURT:  Okay.  All right.  So I'll note that for

3   the record.  And, Mr. Buch, please submit an amended statement

4   of fees on that making that correction.

5        MR. BUCH:  Thank you.

6        THE COURT:  Do we need a timeline?  How long do you

7   need to do that?

8        MR. BUCH:  Well, we can do the 30 days again because

9   we do join it up with the UpRight fee application.  So it gets

10  all combined in one.

11        THE COURT:  Okay.  All right.  Okay, 30 days on the

12  amended statement of fees.

13        MR. BUCH:  Thank you.

14        THE COURT:  The Court notes for the record here that

15  the United States Trustee filed a motion for 2004 exam of Mr.

16  Buch and the debtor, which was granted on November 5th, 2019.

17  The parties entered into a stipulated protective order that was

18  entered on February 28th, 2020.  It's unclear whether that has

19  ever occurred.

20        The debtors paid $1,775 in attorney's fees to UpRight

21  from August 22nd, 2018 over a seven-month period to March 8th,

22  2019.  The case was then filed on August 30th, 2019 about five

23  months after it was paid in full.  And within the year prior to

24  filing, a judgment was entered against the debtors in state

25  court, and the debtors were subsequently garnished.  There was

1  also a pending foreclosure action against the debtors at the

2  time the case was filed.  Debtor is unemployed and had no

3  income at the time of filing, so it would appear he would

4  qualify for a fee waiver but yet none was filed.

5           Has a 2004 exam taken place in this case?

6           MR. SKAGGS:  It has, Your Honor.  It took place --

7  correct me if I'm wrong, Ron -- but I think in early March.

8  But, again, we would like to request that we be allowed to take

9  that examination of the chief operating officer, which we think

10 would be not only important in the Curry case but also all of

11 the other cases as well.  So we would like to -- you know,

12 depending upon the Court's decision on that would kind of

13 dictate this case, as well.

14          THE COURT:  Okay.  If the Court granted, just for

15 scheduling purposes, you're not going to need to take a

16 separate exam of the COO in each case, are you?  It would be

17 like one exam that would be applicable to all?

18          MR. SKAGGS:  Yeah.  I would not want to take an

19 examination in every case, no.

20          THE COURT:  Okay.  All right.  We'll get that order

21 entered soon then on that case -- on that issue.

22          All right.  Based upon the facts as set forth in the

23 record, the fact that an additional 2004 exam needs to be

24 taken, the motion to close the case in the Johnson case will be

25 denied, and a written order we'll enter.

1          Next case, please.

2          COURTROOM DEPUTY:  Docket Number 32, United States

3    Trustee versus Peggy Chapman and Ron Buch.

4          MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

5          MR. ARMGARDT:  Charles Armgardt for UpRight Law and

6    Ron Buch.

7          MR. BUCH:  Ron Buch for Ms. Chapman.

8          THE COURT:  All right.  Any additional legal analysis

9    or facts to be brought to the Court's attention?

10         MR. ARMGARDT:  No, Your Honor.

11         THE COURT:  Okay.  Let the record reflect the United

12   States Trustee filed a motion for 2004 exam of Ron Buch and the

13   debtor.  The motion was granted on April 28th, 2020, and a

14   written order was entered on August 4th, 2020.

15         The debtors paid $1,675 in attorney's fees to UpRight

16   from February 9th, 2019 to January 13th, 2020, a period of 11

17   months.  The case was then filed shortly thereafter the next

18   month on February 24th, 2020.

19         The statement of financial affairs shows that during

20   the year prior to filing when the debtors were making payments,

21   creditors Crown Asset Management, LLC, and One Main Financial,

22   LLC, filed suit against the debtor.  The Crown Asset Management

23   suit is listed on the statement of financial affairs as

24   dismissal 1/15/2020, while One Main Financial Group suit is

25   shown to have concluded in a judgment.  The statement of

102

 1   financial affairs also showed that a small claims suit filed by

 2   Asset Acceptance, LLC, in 2013 was also concluded in a judgment

 3   during the year-period prior to filing the bankruptcy.

 4          Subsequent to this, United States Trustee informed

 5   the Court that one of the state court actions was filed on

 6   September 20th, 2019, and a default judgment was entered on

 7   November 6th, 2019.  On September 8th, 2020, just days before

 8   she completed her installment payments to UpRight, debtor filed

 9   a motion to vacate that default judgment that was just entered

10   and paid $189 to the state court clerk to do so.

11          Debtor reduced to a limited income to vacate a state

12   court judgment when she had already contacted -- contracted

13   with UpRight for her bankruptcy filing which would have

14   eliminated that debt.

15          Has the 2004 exam taken place yet?

16          MR. SKAGGS:  We have attempted to set that up, Your

17   Honor.  The problem is -- and correct me again, Mr. Buch, if

18   I'm wrong -- but I believe Ms. Chapman does not have internet

19   access and does not have a telephone suitable with enough

20   minutes, I guess, to conduct the examination.  So we're trying

21   to work through the logistics of it, Your Honor.  It may be

22   that we get permission to travel to Ms. Chapman and take the

23   examination, although that doesn't help Mr. Buch with his

24   issues.  So we're trying to get through this examination and

25   through the logistics to get the schedules.  So we'll --

1            MR. BUCH:  I -- sorry for interrupting here.  I

2    thought that was the Marsha Chamberlain case.  I don't

3    recognize that issue being present in this case.

4            MR. SKAGGS:  I thought it was this case, but in any

5    event, if they haven't -- Judge, it has not been set, but we

6    will work to get it set.

7            THE COURT:  Okay.  All right.

8            So for the reasons stated in the record, the Court's

9    concern of the fact as dictated by -- set forth in the

10   schedules and statements of financial affairs, that the 2004

11   exam despite an order there hasn't been set yet -- and I

12   understand the timing and the volume of these things as to why

13   they haven't been set -- the motions to close the case are

14   being denied in the Peggy Chapman case.  A written order we'll

15   issue.

16           Next case, please.

17           COURTROOM DEPUTY:  Docket Number 33, United States

18   Trustee versus Angie McClatchery and Ron Buch.

19           MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

20           MR. ARMGARDT:  Charles Armgardt for UpRight Law and

21   Ron Buch.

22           MR. BUCH:  Ron Buch for Ms. McClatchery.

23           THE COURT:  Okay.  We have motions to close with

24   objections filed by the Trustee.  Any other additional legal

25   argument or facts to be brought to the Court's attention?

1          MR. ARMGARDT:  No, Your Honor.

2          THE COURT:  All right.  Let the record reflect U.S.

3  Trustee filed a motion for 2004 exam of Ron Buch and the

4  debtor.  The motion was granted on April 28th, 2020.  A written

5  order was entered on August 12th, 2020.

6          The debtor paid $1,050 in attorney's fees to UpRight

7  from June 15th to December 31st, 2019, and the case was filed

8  about two months later on February 26th, 2020.

9          The statement of affairs reflects the following cases

10  the debtor was involved in within one year prior to filing the

11  case: a small claims action by Protestant Memorial Medical, a

12  small claims action by Ardmore Finance Company, post-collection

13  actions actually put in place on the Protestant Memorial Medica

14  claim, and the Ardmore Finance one was listed as pending.  St.

15  Louis Hospital has a small claims action which showed post-

16  collection -- post but judgment collection.  The Housing

17  Authority filed a forcible entry and detainer suit, and it was

18  listed as status concluded with a judgment.

19          Ardmore Finance garnished their wages in the 12-month

20  period prior to filing and Title Max attached suit and

21  (indiscernible) against the debtor's 1990 Volkswagen Cabrio on

22  October 15th, 2019 during the time frame within which the

23  debtor was making these payments to UpRight.

24          Has the 2004 exam taken place?

25          MR. SKAGGS:  No, Your Honor.  The document were

1  produced on September 11th, so we'll put this in the queue to

2  do, as well.

3      THE COURT:  Okay.  So the documents have been

4  produced but no 2004 exam taken yet.  So for the reasons set

5  forth and the facts identified by the Court and the fact the

6  2004 exam has not taken place but is in progress, at least the

7  documents are produced, the motion to close the case will be

8  denied, a written order to issue.

9      Next case, please.

10      COURTROOM DEPUTY:  Docket Number 34, United States

11  Trustee versus Shaune and Micah Scruggs and Ron Buch.

12      MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

13      MR. ARMGARDT:  Charles Armgardt for UpRight Law and

14  Ron Buch.

15      MR. BUCH:  Ron Buch for the Scruggs.

16      THE COURT:  Okay.  Any additional legal argument or

17  any facts to be brought to the Court's attention?

18      MR. ARMGARDT:  No, Your Honor.

19      THE COURT:  Okay.  Let the record reflect the debtors

20  paid $1,775 in attorney's fees to UpRight from April 16th, 2019

21  through July 26th, 2019.  The case then wasn't filed until

22  seven months later, February 28th, 2020.

23      The fee statements that were submitted shows that the

24  debtor received a six-month compliance call from Mr. Buch on

25  April 17, 2019.  And the debtor did not speak to Attorney Buch

1  again until they finally met in person on September 9th, 2019,

2  nearly five months later.  The debtor did not speak to attorney

3  again until February 27th, 2020, the date the case was filed.

4  So we have this big gap without speaking to an attorney.

5          The U.S. Trustee requested a 2004 exam of Mr. Buch

6  which was granted on April 28th, 2020.  I don't think we have a

7  written order on that yet.  We'll get that out immediately if

8  we haven't.

9          So I'm going to take it the 2004 exam has not taken

10  place yet?

11          MR. SKAGGS:  It has not, Judge, but we have received

12  the documents.  So I think maybe the Court did enter an order.

13          THE COURT:  Okay.  And these notes might not be --

14  what I'm looking at, I may not have updated them.

15          MR. SKAGGS:  Yeah.  (Indiscernible).

16          THE CLERK:  This is Camille.  It has -- the written

17  order has been entered in this case.

18          THE COURT:  Okay.  Thank you.  Thank you.  I know we

19  were getting them out and --

20          THE CLERK:  Sorry about that.

21          THE COURT:  No, no problem.  We had a lot of cases

22  set for today, so my note-taking, you know, as you get towards

23  the end, the notes get smaller.

24          MR. SKAGGS:  Yeah.

25          THE COURT:  It's on me.  But anyway, based on the

1 fact that the 2004 exam has not taken place yet but at least

2 the documents have been produced, I'm glad you folks are moving

3 forward on that, and the facts as set forth in the record, the

4 gaps, the failure to talk with an attorney during that period

5 makes the Court, you know, wonder why the fee was so much

6 higher than what Mr. Buch usually charges.  Based on that, the

7 motion to close the case will be denied.  A written order will

8 be entered.

9    Next case, please.

10    COURTROOM DEPUTY:  Docket Number 35, Jarian and

11 Monica Stiff.

12    MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

13    MR. ARMGARDT:  Charles Armgardt for UpRight Law and

14 Ron Buch.

15    MR. BUCH:  Ron Buch for the Mr. and Ms. Stiff.

16    THE COURT:  Okay.  We have a status hearing today

17 regarding the disclosure of attorney compensation.  This case,

18 the debtors paid UpRight $1,725 in installments from July 20th,

19 2018 through May 6th, 2020, a period of over two years before

20 the case was ultimately filed on August 31st, 2020.  In that

21 time, the debtors had two cars repossessed and several

22 judgments taken against them.

23    The statement of financial affairs shows three

24 different creditors who were doing collection action that was

25 concluded during that period including a AAA check mate which

1  garnished $476 in the 12 months prior to filing bankruptcy.

2  Crystal Rock had garnished $1,400 from the debtors between

3  November 19th and March 2020 and Instacredit Auto Mart which

4  repossessed the debtors' 2007 Toyota Camry on June 2020 and

5  (indiscernible) repossessed from the debtors' 2012 Nissan Jewel

6  on August 27th, 2020.

7  Schedule I shows the debtors' income as $2,678.42,

8  which includes $851 a month in unemployment for one of the

9  debtors, and their household size is three. So the debtors

10  would qualify for a fee waiver but none was made. This case is

11  a relatively new case, and I would like to have a fee statement

12  itemization filed with this.

13  Mr. Buch, how long will it take you to put one

14  together?

15  MR. BUCH: I believe 30 days would be just fine,

16  Judge, if it please the Court.

17  THE COURT: Okay. So we will have a fee itemization

18  due in 30 days. Thank you.

19  The next case, please.

20  COURTROOM DEPUTY: Docket Number 36, United States

21  Trustee versus Terry Dedmon and Khristie Gable and Ron Buch.

22  MR. SKAGGS: Mark Skaggs for the U.S. Trustee.

23  MR. ARMGARDT: Charles Armgardt for UpRight Law and

24  Ron Buch.

25  MR. BUCH: Ron Buch for the Dedmon and Gable.

1    THE COURT:  Okay.  Any additional legal argument or
2  facts the parties would like to make with regard to this case?
3    MR. ARMGARDT:  No, Your Honor.
4    THE COURT:  All right.  Let the record reflect that
5  the debtors paid $1,725 between July 5th, 2018 and October
6  23rd, 2018.  And the case was ultimately filed on January 30,
7  2019.  The United States Trustee filed a motion for 2004 exam
8  of the debtor and Ron Buch, which was granted on November 5th,
9  2020.
10    The question I have is whether a 2004 exam was ever
11  taken.
12    MR. SKAGGS:  They have not been taken, Judge.  We did
13  receive the documents in April of this year, 2019 -- 2020.
14    THE COURT:  Okay.  All right.  How long would it take
15  to get that 2004 exam set?
16    MR. SKAGGS:  Hopefully we can get that conducted
17  within the next 60 days.
18    THE COURT:  Okay.  All right.  I don't have a lot of
19  information to go on in this one.  I don't believe we've had a
20  fee statement filed in this one either.  Is that correct,
21  Camille?
22    THE CLERK:  I'll have to check on that one.
23    THE COURT:  Okay.
24    MR. SKAGGS:  Judge, I do not see an itemized fee
25  statement being filed in that particular case.

1          THE COURT:  Okay.  I didn't think we had one, and I

2  can't pull it up right now on my computer.

3          THE CLERK:  I'm looking.  It does not look like there

4  is one.

5          THE COURT:  Okay.  Mr. Buch, could we have a fee

6  statement on this one in 30 days?

7          MR. BUCH:  I believe we can do that, Judge.  Thank

8  you.

9          THE COURT:  Okay.  Thank you.

10         All right.  Based on the fact that 2004 exams were

11 not taken yet, the fee was much higher than what Mr. Buch would

12 normally charge, and I don't have a fee statement to look at

13 yet -- which is no one's fault, it's requesting that and asking

14 for it -- the motion to close case will not be granted at this

15 time, and a written order we'll issue.

16         Next case, please.

17         COURTROOM DEPUTY:  Docket Number 37, United States

18 Trustee versus Clinton and Pamela Jones and Ron Buch.

19         MR. SKAGGS:  Mark Skaggs for the U.S. Trustee.

20         MR. ARMGARDT:  Charles Armgardt for UpRight Law and

21 Ron Buch.

22         MR. BUCH:  Ron Buch for the Joneses.

23         THE COURT:  All right.  Any additional legal

24 argument?  We have two motions to close and objections filed by

25 the U.S. Trustee.  Any additional legal arguments by the

1  parties or additional facts to bring to the Court's attention?

2          MR. ARMGARDT:  No, Your Honor.

3          THE COURT:  Okay.  Let the record reflect that the

4  debtors paid UpRight attorney's fees of $1,725 between February

5  15th, 2019 and August 30th, 2019.  The case was then filed

6  about three months later in November 26th, 2019.  The debtor's

7  2015 Nissan Versa was repossessed in January of 2019, and the

8  debtors made a $200 payment to Anita Smith for money owed in

9  August 2019.

10          The fee statement shows that the debtor initially

11  spoke with a non-UpRight attorney on February 6th, 2019, and

12  Mr. Buch then a couple of days later, February 8th, did a six-

13  minute compliance call and did not speak with the debtors again

14  until September 4th, 2019, seven months later.  In the time

15  between February and September, there were five entries of

16  creditor verification by non-staff members.  We don't know

17  quite what that means.

18          Has the 2004 exam -- a 2004 exam was requested, and

19  orders were entered allowing it.  Has the 2004 exam taken place

20  in this case?

21          MR. SKAGGS:  No, Your Honor.  That order was entered

22  September 10th, so we're still waiting for the document

23  production.

24          THE COURT:  Okay.  All right.  For the reasons stated

25  on the record, the fact that the 2004 exam is still planning,

1  hasn't been completed, the motion to close the case will be

2  denied, a written order to enter.

3         Next case, please.

4         COURTROOM DEPUTY:  Docket Number 38, United States

5  Trustee versus Theresa Reynolds and Don Buch.

6         MR. SKAGGS:  Mark Skaggs for the U. S. Trustee.

7         MR. ARMGARDT:  Charles Armgardt for UpRight Law and

8  Ron Buch.

9         MR. BUCH:  Ron Buch for Ms. Reynolds.

10        THE COURT:  Okay.  We have two motions to close in

11  this case with objections filed by the United States Trustee.

12  Any additional legal argument the parties would like to make or

13  any facts to bring to the Court's attention in the Reynolds

14  case?

15        MR. ARMGARDT:  No, Your Honor.

16        THE COURT:  All right.  Let the record reflect that

17  the debtors paid $1,675 in attorney's fees to UpRight from July

18  12th, 2018 to May 3rd, 2019, a period of about ten months.  The

19  case was then filed four months later on September 26th, 2019.

20  During that time frame, the debtor's mobile home valued at

21  $28,000 was repossessed in April of 2019, and this was after

22  the fees had been paid in full or close to the time the fees

23  were just about paid in full.

24        The fee statement reveals no assistance from UpRight

25  counsel relating to this repossession.  There was one cryptic

1  notation by a non-attorney staff member, J. Flores, on April

2  19th, 2019 that states: "Received notice of abandoned

3  property." The docket sheet for the case confirms that the

4  debtor has also paid the filing fee of $335. Schedule I shows

5  that the debtor's monthly income was only $806 consisting of

6  unemployment and SNAP benefits. They were well below the cap

7  for filing a fee waiver, yet no fee waiver was filed. It makes

8  the Court wonder if the case could have been filed sooner if

9  the fee waiver had been requested and perhaps they may have not

10  lost their home. These are things that the Court just does not

11  know or have an answer to.

12       The U.S. Trustee filed a motion for 2004 exam of Mr.

13  Buch and the debtors. It was granted on April 20th. A written

14  order was entered on August 20th. The motions to close this

15  case were filed on August 24th.

16       The Court is wondering if the 2004 -- probably the

17  2004 exams have not taken place. Is that correct?

18       MR. SKAGGS: That is correct, Your Honor. We're

19  waiting for the document production.

20       THE COURT: Okay. We --

21       MR. BUCH: And Ron Buch with one little insertion

22  here. This was a Mike Curry case from the inception. And if

23  the Court has a fee itemization, the date for Mike's compliance

24  call was not included there. It should be July 12th, 2018.

25  And that's if the Court has that.

114

1          THE COURT:  Okay.  I do have a fee statement.  That's
2  where I got the information from.

3          MR. BUCH:  Right.

4          THE COURT:  So, okay, we'll note that for the record.

5          All right.  Based on the fact that the 2004 exam has
6  not taken place yet and the Court's concerns about the
7  repossession and lack of legal advice during that time frame
8  and failure to file a fee waiver, the Court denies the motion
9  to close the case.  A written order we'll issue.

10          Next case, please.

11          COURTROOM DEPUTY:  Judge, this is Jake.  To be
12  consistent, do you want him to file an amended itemization of
13  fees within 30 days?

14          THE COURT:  Yes.  Please file an amended fee
15  statement in 30 days --

16          MR. BUCH:  Thank you.

17          THE COURT:  -- on this case.

18          MR. BUCH:  Thank you.

19          THE COURT:  Thank you.  All right.  We'll all be on
20  the same page then.

21          Okay.  Next case, please.

22          COURTROOM DEPUTY:  Docket Number 39, United States
23  Trustee versus George Wise and Ron Buch.

24          MR. SKAGGS:  Mark Skaggs for the U. S. Trustee.

25          MR. ARMGARDT:  Charles Armgardt for UpRight Law and

1  Ron Buch.

2          MR. BUCH:  Ron Buch for Mr. Wise.

3          THE COURT:  All right.  Any additional legal argument

4  or facts to bring to the Court's attention in the Wise case?

5          MR. ARMGARDT:  No, Your Honor.

6          THE COURT:  All right.  Let the record reflect the

7  debtors paid $1,675 in attorney's fees to UpRight from October

8  9th, 2018 to October 15th, 2018.  So relative quickly it was

9  paid, but the case was not filed until March 27th, 2020.

10          Within the year prior to filing, the debtor was a

11  party to a small claims action.  It indicates the small claims

12  action filed in 2017.  Well, that would have been the year

13  prior to filing.  Anyway, it was concluded in a judgment, and

14  another small claims action was filed in 2019 that was pending

15  at the time.  The debtor's income is $1,202.64.  They qualify

16  for a waiver of the filing fee, but no waiver was requested.

17          You know, the Court has concerns that this case was

18  paid in full, but yet not filed while the debtor was subject to

19  small claims actions and a judgment.  A 2004 exam was requested

20  of Mr. Buch and the debtor.  And it was taken under advisement

21  on September 1st, 2020.  And I don't believe we've gotten an

22  order out on that, but we will if we haven't.

23          Have we got this one out yet, Camille?

24          THE CLERK:  No.  We're still working on it.

25          THE COURT:  Okay.  We had a flurry of them lately.  I

1 apologize for that.

2          Okay.  The -- can you all still hear me?

3          MR. SKAGGS:  Yes.

4          MR. BUCH:  I can hear you fine.

5          MR. ARMGARDT:  Yes, Your Honor.

6          THE COURT:  Okay.  You know what, I started wearing

7 this week these little iPod things in your ears, whatever

8 they're called.  And I think they're running out of batteries

9 because I'm getting this weird sound that goes (makes sound).

10 That's why I was wondering if you could still hear me.  I can

11 hear you -- well, we're almost done here.  Hopefully,

12 (indiscernible) or I have to pick my phone up.  Okay.

13          UNIDENTIFIED SPEAKER:  Fine right now, Judge.

14          THE COURT:  Okay.  Based upon the facts as set forth

15 in the record here and the fact the 2004 exam motion we're

16 waiting to rule on, the motion to close will be denied.  A

17 written order we'll enter.

18          Next case.

19          COURTROOM DEPUTY:  Docket Number 40, United States

20 Trustee versus Annette and Charles Crow and James Ford.

21          MR. SKAGGS:  Mark Skaggs for the U. S. Trustee.

22          MR. ARMGARDT:  Charles Armgardt for UpRight Law and

23 James Ford.

24          THE COURT:  Okay.  We have motions to close and

25 objections filed by the U.S. Trustee.  Any additional legal

117

1  argument or facts the parties would like to bring to the

2  Court's attention?

3          MR. ARMGARDT:  No, Your Honor.

4          THE COURT:  All right.  Let the record reflect that

5  the debtors paid $1,150 to UpRight plus the filing fee from

6  August 5th, 2019 through November 1st, 2019.  The case then was

7  filed several months later on March 17th, 2020.  Neither debtor

8  was employed at the time of filing.  Their income totaled

9  $1,633 comprised of Social Security benefits and SNAP benefits.

10  Again, no fee waiver was requested for the debtors.

11          The. U.S. Trustee filed a motion to examine debtor's

12  counsel, James Ford, that was granted on April 29th.  A written

13  motion -- written order was entered in August 2020.  And I'm

14  going to guess that the 2004 exams probably haven't been able

15  to be taken yet.  Is that correct?

16          MR. SKAGGS:  That is correct, Your Honor.

17          THE COURT:  Have you received the documents?

18          MR. SKAGGS:  No.  I think the deadline is a few days

19  from now.  I think the order was entered on August 24th so

20  they've got a couple of more days to provide that

21  documentation.

22          THE COURT:  That is moving, okay.

23          MR. SKAGGS:  Yes.

24          THE COURT:  Based on the facts as set forth in the

25  record and the Court's concerns about the filing fees and

1   failure to file a filing fee waiver and the fact that the 2004

2   exam is still pending, the motion to close the case will be

3   denied.  A written order we'll issue.

4           Next case, please.

5           COURTROOM DEPUTY:  Docket Number 41, United States

6   Trustee versus Darrell Kulik and James Ford.

7           MR. SKAGGS:  Mark Skaggs for the U. S. Trustee.

8           MR. ARMGARDT:  Charles Armgardt for UpRight Law and

9   James Ford.

10          THE COURT:  All right.  Any additional legal argument

11  or any facts to be brought to the Court's attention here with

12  regard to the motions to close and the objections filed by the

13  Trustee?

14          MR. ARMGARDT:  No, Your Honor.

15          THE COURT:  Okay.  Let the record reflect that the

16  debtor paid $1,050 plus the filing fee of $335 to UpRight over

17  a period from August 13th, 2019 to February 19, 2020.  The

18  debtor's Social Security benefits during that period were

19  garnished monthly for overpayment of VA pension benefits.  The

20  debtor's income is $2,215 in Social Security benefits.

21  Debtor's only assets were $800 in household items, $1,529 in

22  other financial assets, which included his $1,200 COVID

23  stimulus check.

24          The U.S. Trustee filed a motion for the examination

25  of James Ford and the debtor.  That was taken under advisement

119

1  on August 26th, 2020.  I don't think we've got an order out on

2  that yet, which we will do shortly.

3           THE CLERK:  Judge, this --

4           MR. SKAGGS:  Judge, that order was entered.

5           THE CLERK:  -- (indiscernible) on that one.

6           THE COURT:  Okay, those are out.  Okay, good, good.

7           THE CLERK:  Yeah.

8           THE COURT:  Okay.  So we did have an order granting

9  that motion.  So having said that, the Court is going to deny

10 the motion to close the case at this point based upon the

11 issues raised regarding garnishment of Social Security and

12 Social Security benefits and failure to file a fee waiver and

13 the question of why was this filed and the fact that the 2004

14 exams were not taken.  So on that basis, the motion to close

15 will be denied, and a written order we'll issue.

16           Is that the last case, Jake?

17           COURTROOM DEPUTY:  That is.

18           THE COURT:  Okay.  That's the last case on our docket

19 today.  To the extent I did not say so with regard to these

20 motions to close case, I've denied all of the motions to close

21 case.  A written order we'll issue on each of those cases, and

22 we'll get those out as fast as we can, all 40 of them.

23           All right.

24           MR. ARMGARDT:  Thank you.

25           THE COURT:  Okay.  That should conclude our hearing

120

1  today.  Anything else?

2          MR. BUCH:  Thank you, Judge.

3          THE COURT:  All right.  Then that will be concluded.

4  The docket for September 16th is completed.  Thank you.

5          COURTROOM DEPUTY:  Thank you.  Thanks, Judge.

6          THE COURT:  Okay.

7          COURTROOM DEPUTY:  Court is adjourned.

8                        * * * * *

9

10              **C E R T I F I C A T I O N**

11          I, DIPTI PATEL, court approved transcriber, certify

12  that the foregoing is a correct transcript from the official

13  electronic sound recording of the proceedings in the above-

14  entitled matter, and to the best of my ability.

15

16  /s/ Dipti Patel

17  DIPTI PATEL

18  J&J COURT TRANSCRIBERS, INC.      DATE:  September 24, 2020

19

20

21

22

23

24

25